No. 23-1751

# United States Court of Appeals for the Seventh Circuit

---

**YORAM KAHN**,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
*Plaintiff-Appellant,*

**v.**

**WALMART INC.**,
*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:22-cv-04177 (Hon. Sara L. Ellis)

---

## APPELLEE WALMART INC.'S RESPONSE BRIEF

---

Daniel M. Blouin
*Counsel of Record*
Frank A. Battaglia
Monica T. Kociolek
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600 (phone)
312-558-5700 (fax)
DBlouin@winston.com
FBattaglia@winston.com
MKociolek@winston.com

*Counsel for Appellee Walmart Inc.*

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-1751</u>

Short Caption: <u>Kahn v. Walmart</u>

**|_|   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Walmart Inc.</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Winston & Strawn LLP</u>

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

<u>N/A</u>

ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

<u>N/A</u>

Attorney's Signature: <u>s/ Daniel M. Blouin</u>          Date: <u>September 15, 2023</u>

Attorney's Printed Name: <u>Daniel M. Blouin</u>

Counsel of Record: Yes <u>X</u>   No __

Address: <u>Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601</u>

Phone Number: <u>312-558-5600</u>          Fax Number: <u>312-558-5700</u>

E-Mail Address: <u>DBlouin@winston.com</u>

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-1751</u>

Short Caption: <u>Kahn v. Walmart</u>

**|_|     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Walmart Inc.</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Winston & Strawn LLP</u>

(3)   If the party or amicus is a corporation:

   i)     Identify all its parent corporations, if any; and

   <u>N/A</u>

   ii)    list any publicly held company that owns 10% or more of the party's or amicus' stock:

   <u>N/A</u>

---

Attorney's Signature: <u>s/ Frank A. Battaglia</u>          Date: <u>September 15, 2023</u>

Attorney's Printed Name: <u>Frank A. Battaglia</u>

Counsel of Record: Yes ___ No <u>X</u>

Address: <u>Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601</u>

Phone Number: <u>312-558-5600</u>          Fax Number: <u>312-558-5700</u>

E-Mail Address: <u>FBattaglia@winston.com</u>

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-1751</u>

Short Caption: <u>Kahn v. Walmart</u>

|__|     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Walmart Inc.</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Winston & Strawn LLP</u>

(3)     If the party or amicus is a corporation:

    i)     Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

    <u>N/A</u>

---

Attorney's Signature:  <u>s/ Monica T. Kociolek</u>          Date:  <u>September 15, 2023</u>

Attorney's Printed Name:  <u>Monica T. Kociolek</u>

Counsel of Record: Yes ___  No <u>X</u>

Address:  <u>Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601</u>

Phone Number: <u>312-558-5600</u>          Fax Number: <u>312-558-5700</u>

E-Mail Address: <u>MKociolek@winston.com</u>

# TABLE OF CONTENTS

**Page**

CIRCUIT RULE 26.1 DISCLOSURE STATEMENTS .......................................ii-iv

TABLE OF AUTHORITIES ......................................................................... vii

REQUEST FOR ORAL ARGUMENT ............................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE .......................................................................... 2

SUMMARY OF THE ARGUMENT ................................................................ 3

STANDARD OF REVIEW ............................................................................... 4

ARGUMENT .................................................................................................... 6

I.    The District Court Properly Rejected Kahn's Contention that
      Illinois Law Requires Pricing Perfection. .................................................. 6

      A.    State laws around the country acknowledge that pricing
            errors are to be expected. .................................................................. 7

      B.    The United States Department of Commerce similarly
            recognizes the inevitability of pricing errors. .................................. 8

      C.    The Illinois appellate court has rejected the notion that
            pricing perfection is required ........................................................... 10

II.   The District Court Properly Concluded that the Asserted
      Claims Require Deception and Intentionality, Neither of Which
      Has Been Sufficiently Alleged Here. ........................................................ 11

      A.    The Complaint does not contain sufficient facts to
            establish that Walmart engaged in a deceptive act. ..................... 13

      B.    Walmart did not intend for its customers to rely on
            incorrect shelf pricing and reasonable consumers would
            not have been misled. ...................................................................... 15

III.  Kahn's "Unfairness" Claim Is Similarly Defective. ............................... 22

IV.   The District Court Properly Dismissed the UDTPA Claim. ................... 26

V.    The Unjust Enrichment Claim Cannot Stand. ......................................... 28

VI.   The District Court Properly Dismissed Each of the Asserted
      Claims *With Prejudice*. .............................................................................. 28

CONCLUSION ................................................................................................ 29

**CERTIFICATE OF COMPLIANCE**

**CIRCUIT RULE 30(D) STATEMENT**

**CERTIFICATE OF SERVICE**

**ADDENDUM A**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014) ..................................................... 4

*Am. Buyers Club of Mt. Vernon, Ill., Inc. v. Honecker,*
  361 N.E.2d 1370 (Ill. App. Ct. 1977) ...................................... 22

*Ambassador Animal Hosp., Ltd. v. Elanco Animal Health Inc.,*
  74 F.4th 829 (7th Cir. 2023) ...................................................... 4

*AnchorBank, FSB v. Hofer,*
  649 F.3d 610 (7th Cir. 2011) ...................................................... 6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................... 4, 5, 20, 22

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Board of Med.
    Specialties,*
  15 F.4th 831 (7th Cir. 2021) .................................................... 29

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................. 4, 5

*Benson v. Fannie May Confections Brands, Inc.,*
  944 F.3d 639 (7th Cir. 2019) ...................................... 17, 18, 24

*Benson v. Fannie May Confections Brands, Inc.,*
  2018 WL 1087639 (N.D. Ill. 2018) ......................................... 26

*Borsellino v. Goldman Sachs Grp., Inc.,*
  477 F.3d 502 (7th Cir. 2007) ...................................................... 5

*Bratton v. Roadway Package Sys., Inc.,*
  77 F.3d 168 (7th Cir. 1996) ...................................................... 29

*Bread Pol. Action Comm. v. FEC,*
  455 U.S. 577 (1982) .................................................................. 12

*Brooks v. Ross,*
  578 F.3d 574 (7th Cir. 2009) ...................................................... 5

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
    761 F.3d 732 (7th Cir. 2014) .......................................... 14, 20, 23, 26, 27

*Chow v. Aegis Mortg. Corp.*,
    286 F. Supp. 2d 956 (N.D. Ill. 2003) ..................................... 21

*CHS Acquisition Corp. v. Watson Coatings, Inc.*,
    No. 17-CV-4993, 2018 WL 3970137 (N.D. Ill. Aug. 20, 2018).............. 11

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ............................................ 28

*Cocroft v. HSBC Bank USA, N.A.*,
    796 F.3d 680 (7th Cir. 2015) ............................................ 11

*Connick v. Suzuki Motor Co.*,
    675 N.E.2d 584 (Ill. 1996) ............................................ 6, 11

*Davis v. G.N. Mortg. Corp.*,
    396 F.3d 869 (7th Cir. 2005) ............................................ 15

*Dunn v. Menard, Inc.*,
    880 F.3d 899 (7th Cir. 2018) .......................................... 10, 16

*Fosnight v. Jones*,
    41 F.4th 916 (7th Cir. 2022) ............................................ 29

*Gagan v. Am. Cablevision, Inc.*,
    77 F.3d 951 (7th Cir. 1996) ............................................. 29

*Gansberg v. Kroger*,
    No. 2022-CH-08071 (Ill. Cir. Ct. Cook Cnty. Apr. 7, 2023)...................... 16, 17, 27

*Gohari v. McDonald's Corp.*,
    No. 2016-CH-08261, 2017 WL 11676255 (Ill. Cir. Ct. Cook Cnty.
    July 13, 2017) ..................................................... 15, 24, 25

*Haywood v. Massage Envy Franchising, LLC*,
    887 F.3d 329 (7th Cir. 2018) ......................................... 22, 23, 29

*In re Herbal Supplements*,
    2017 WL 2215025 ....................................................... 27

*Hickey v. Schomig*,
    240 F. Supp. 2d 793 (N.D. Ill. 2002) ..................................... 12

*Horist v. Sudler & Co.*,
    941 F.3d 274 (7th Cir. 2019) ................................................ 28

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*,
    665 F.3d 930 (7th Cir. 2012) ................................................ 6

*Kahn v. Target Corp.*,
    Case No. 0:23-cv-00500-PJS-TNL (D. Minn.) ........................... 6

*Kahn v. Target Corp.*,
    Case No. 1:22-cv-4178 (N.D. Ill.) .......................................... 6

*Killeen v. McDonald's Corp.*,
    317 F. Supp. 3d 1012 (7th Cir. 2018) ................................... 20

*Kim v. Carter's Inc.*,
    598 F.3d 362 (7th Cir. 2010) ........................................ 18, 19

*Kljajich v. Whirlpool Corp.*,
    2015 WL 12838163 (N.D. Ill. Sept. 25, 2015) (St. Eve, J.) ........ 12

*Le v. Kohls Dep't Stores, Inc.*,
    160 F. Supp. 3d 1096 (E.D. Wisc. 2016) .............................. 27

*Lynch Ford, Inc. v. Ford Motor Co.*,
    957 F. Supp. 142 (N.D. Ill. 1997) .................................. 11, 26

*Mullins v. Direct Digit., LLC*,
    795 F.3d 654 (7th Cir. 2015) .............................................. 18

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
    631 F.3d 436 (7th Cir. 2011) ............................... 5, 6, 11, 23

*Robinson v. Walgreen Co.*,
    2022 WL 204360 (N.D. Ill. 2022) ................................... 23, 28

*Saunders v. Mich. Ave. Nat. Bank*,
    662 N.E.2d 602 (Ill. App. Ct. 1996) ................................... 20

*Slaney v. The Int'l Amateur Athletic Fed'n*,
    244 F.3d 580 (7th Cir. 2001) ............................................. 23

*Tierney v. Advocate Health & Hosp. Corp.*,
    797 F.3d 449 (7th Cir. 2015) .............................................. 5

*Toulon v. Cont'l Cas. Co.*,
    2016 WL 561909 (N.D. Ill. Feb. 12, 2016) ......................... 6, 11

*Tudor v. Jewel Food Stores,*
681 N.E.2d 6 (Ill. App. Ct. 1997)................................................. 4, 10, 15, 16, 19, 21

*Ulrich v. Probalance, Inc.,*
2017 WL 3581183 (N.D. Ill. Aug. 18, 2017).................................................... 26, 27

*United States v. Sanders,*
688 F. Supp. 367 (N.D. Ill. 1988) ........................................................................ 12

*Van Zeeland v. Rand McNally,*
532 F. Supp. 3d 557 (N.D. Ill. 2021) .................................................................... 27

*Williams v. Bruno Appliance and Furniture Mart,*
379 N.E.2d 52 (Ill. App. Ct. 1978)........................................................................ 13

**Statutes**

815 ILCS (12) ..................................................................................................... 13

815 ILCS 505/2J.2............................................................................................ 12, 13

815 ILCS 510/2(a)(1)–(12) ............................................................................ 12, 13, 14

815 ILCS 510/3.................................................................................................... 26

California Civil Code § 7103 .................................................................................... 7

Fla. Stat. § 531.44 ................................................................................................. 7

ICFA .....................................................1, 3, 4, 6, 7, 11, 12, 16, 18, 19, 20, 22, 23, 25

Ill. Comp. Stat. 510/2 ........................................................................................... 25

Ill. Comp. Stat. Ann. 470/30 .................................................................................... 9

Illinois Consumer Fraud and Deceptive Business Practices Act 815
ILCS 505/1, *et seq.* ............................................................................................ 1

Illinois Uniform Deceptive Trade Practices Act,
815 ILCS 510/2, *et seq.* ............................1, 3, 4, 6, 11, 12, 13, 14, 16, 23, 25, 26, 27

Mich. Comp. Laws § 445.319 ................................................................................... 7

Mich. Comp. Laws § 445.322 ................................................................................... 7

Mich. Comp. Laws § 445.324 ................................................................................... 7

MS Code § 75-27-51 ............................................................................................... 7

NY Pricing Laws and Regulations § 197-B(3)(b) ............................................... 7

Okla. Stat. § 2-14-38 ..................................................................................... 7

R.C.S.A. § 21a-79-7 ....................................................................................... 7

UDTPA Commentary ................................................................................ 13, 14

**Other Authorities**

16 C.F.R. § 238.0 ......................................................................................... 13

21 C.F.R. pt. 100 ......................................................................................... 18

Cir. R. 34(f) ................................................................................................... 1

Fed. R. App. P. 34(a) ..................................................................................... 1

Fed. R. Civ. P. 8 ......................................................................................... 23

Fed. R. Civ. P. 9(b) ........................................................................... 5, 6, 13, 23

Fed. R. Civ. P. 12(b)(6) ............................................................................. 4, 5

Fed. R. Civ. P. 15 ....................................................................................... 28

Fed. R. Civ. P. 15(a) ................................................................................... 28

https://doi.org/10.6028/NIST.HB.44-2023-upd1 ................................................ 9

https://www.fdacs.gov/Consumer-Resources/Consumer-Rights-and-
    Responsibilities/Weights-and-Measures/What-should-I-do-if-an-
    item-purchased-at-a-store-scans-at-a-different-price-than-the-
    posted-or-advertised-price .................................................................... 8, 9

Ill. Admin. Code tit. 8, § 600.330 .................................................................. 9

## REQUEST FOR ORAL ARGUMENT

To aid the Court in its decisional process, counsel requests oral argument to present Walmart's response on appeal. Fed. R. App. P. 34(a); Cir. R. 34(f).

## JURISDICTIONAL STATEMENT

The jurisdictional statement in Kahn's opening brief is complete and correct.

## STATEMENT OF THE ISSUES

Kahn mischaracterizes the district court's order and the law on price discrepancy claims, and in doing so complicates the issues presented on appeal. The overarching question is whether this Court should affirm the district court's dismissal of Kahn's complaint because he failed to plead sufficient factual allegations to support any of his claims. The following questions are specifically presented with respect to each of Kahn's claims:

1. Did the district court err in concluding Kahn failed to plausibly allege the deception and intent elements of his deceptive practices claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, *et seq*.?

2. Did the district court err in concluding Kahn failed to plausibly allege the unfair conduct and intent elements of his unfair practices claim under the ICFA?

3. Did the district court err in dismissing Kahn's claim under the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/2, *et seq*.?

4. Did the district court err in dismissing Kahn's unjust enrichment claim?

Because the answer to all these questions is no, this Court should affirm.

## STATEMENT OF THE CASE

Appellant Yoram Kahn, an Ohio resident, alleges that he was defrauded when he was charged a total of $1.89 more for six items at a Walmart checkout counter in Niles, Illinois than the prices reflected on the store shelf ("Shelf Pricing"). SA8 ¶¶ 12–13; SA11–15 ¶¶ 24–26.[1] Kahn received a receipt at the time of purchase reflecting the alleged price discrepancy but, instead of raising the issue with the cashier or seeking a refund, he returned to the shelf to photograph the receipt alongside the alleged current Shelf Pricing. *See* SA11–15 ¶¶ 24–26. Within a week, Kahn filed a putative national class action complaint ("Complaint") seeking at least five million dollars in damages based on this purported $1.89 discrepancy and purchases made by his counsel as part of a supposed "investigation" at stores in and outside the state. SA8 ¶ 8; SA17–19 ¶¶ 38–48. On the same day Kahn claims to have been defrauded at a Walmart store in Niles, Kahn also claims (in a separate, virtually identical lawsuit filed by the same counsel) that he was similarly defrauded at a Target store down the block. Dkt. 26 (Def.'s Mot. to Dismiss) at 1 & n.1; Dkt. 26-2 (Ex. A to Def.'s Mot. to Dismiss).[2]

The district court properly concluded that Kahn's attempt to extract millions of dollars from Walmart must be dismissed because his Complaint lacks sufficient factual allegations to establish Walmart engaged in any deceptive act, or that it

---

[1] Kahn's opening brief is cited as "Opening Br. at __," and the Short Appendix to that brief is cited as "SA__."

[2] References to parts of the district court record not included in the Short Appendix are cited as "Dkt. __"

intended Kahn to rely on any incorrectly stickered price. Instead, the factual allegations in the Complaint at most reflect the real-world reality that it is virtually impossible for a retailer to match Shelf Pricing and scanned pricing 100% of the time for the hundreds of thousands of items on shelves. But neither the law nor industry standard require perfection; any contrary position would in effect hold retailers strictly liable any time a Shelf Price fails to match a purchase price, no matter the reason. And Kahn fails to allege any facts that would create an inference that the alleged overcharges were anything other than what they were—mere mistakes.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's judgment dismissing Kahn's Complaint. The district court correctly found that Kahn has not sufficiently pled the requisite elements of any of his individual claims.

The district court's judgment should be affirmed as to Kahn's ICFA and UDTPA claims because Kahn fails to plausibly allege—with necessary particularity—that Walmart's purported imperfect Shelf Prices constitute "deceptive" or "unfair" conduct, or that Walmart intended for Kahn to rely on its inaccurately stickered Shelf Prices. Walmart did not engage in "deceptive" conduct because the facts alleged in the Complaint at most reflect the real-world reality that it is virtually impossible for Walmart to match Shelf Prices and scanned sale prices 100% of the time for the hundreds of thousands of items in its stores. Kahn's limited factual assertions do not create a reasonable inference that the alleged overcharge totaling $1.89 for six of the items Kahn purchased was anything other than a mere mistake. The district court properly rejected Kahn's position that Illinois law requires pricing perfection. *See*

*Tudor v. Jewel Food Stores*, 681 N.E.2d 6 (Ill. App. Ct. 1997). Kahn's assertion that Walmart engaged in an "unfair" business practice fails for similar reasons.

Past that, Kahn's UDTPA claim fails for the additional reason that he does not sufficiently allege a risk of future harm. Furthermore, his unjust enrichment claim is not a separate cause of action under Illinois law, and as such, it fails along with the ICFA and UDTPA claims. Finally, Kahn has not challenged the district court's finding that amendment of the Complaint would be futile. Any contention that he should have been given leave to amend is thus waived; but it is also wrong in any event. Accordingly, the district court properly dismissed the Complaint *with prejudice*.

## STANDARD OF REVIEW

This Court "review[s] Rule 12(b)(6) dismissals de novo, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences in the plaintiff's favor." *Ambassador Animal Hosp., Ltd. v. Elanco Animal Health Inc.*, 74 F.4th 829, 831 (7th Cir. 2023) (affirming district court's dismissal of putative class action for failure to state a claim). To survive a motion to dismiss under Rule 12(b)(6), a complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (plausibility requires "more than a sheer possibility that a defendant has acted unlawfully"). In

other words, a plaintiff must include factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; Fed. R. Civ. P. 12(b)(6).

While well-pleaded facts are taken as true for purposes of a motion to dismiss, factual allegations must be more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Indeed, "allegations in the form of legal conclusions are insufficient" to state a facially plausible claim for relief. *Tierney v. Advocate Health & Hosp. Corp.*, 797 F.3d 449, 451 (7th Cir. 2015). When statutory claims are asserted, a complaint must be dismissed if it "merely parrot[s] the statutory language of [such] claims . . . rather than provid[es] some specific facts to ground those legal claims." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Additionally, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on all claims sounding in fraud. Fed. R. Civ. P. 9(b); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (explaining Rule 9(b) applies to "averments of fraud, not [just] claims of fraud" and therefore "[a] claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements"). To sufficiently plead a fraud-based claim under the heightened Rule 9(b) standard, the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will

necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted). Accordingly, mere conclusory allegations that a defendant's conduct was fraudulent or deceptive are not sufficient. Fed. R. Civ. P. 9(b). And any complaints alleging fraud-based claims "must be pled with the same particularity and specificity as that required under common law fraud." *Toulon v. Cont'l Cas. Co.*, 2016 WL 561909, at *5 (N.D. Ill. Feb. 12, 2016) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)); *Pirelli*, 631 F.3d at 441.

## ARGUMENT

This Court should affirm the district court's dismissal of Kahn's ICFA, UDTPA, and unjust enrichment claims for failure to state a claim.

## I.   The District Court Properly Rejected Kahn's Contention that Illinois Law Requires Pricing Perfection.

Kahn's argument requires that Walmart—and presumably all other retailers who do business in Illinois[3]—be held strictly liable if the Shelf Price does not always match the price charged at the register. Contrary to Kahn's position, pricing perfection is not required in Illinois, nor is it reasonably expected in any state.

---

[3] As noted, the same day Kahn and his counsel filed this case against Walmart, they filed a nearly identical suit against Target in the Northern District of Illinois. *See Kahn v. Target Corp.*, Case No. 1:22-cv-4178; *see also* Dkt. 26-2 (copy of complaint attached as Ex. A to Walmart's motion to dismiss). The case was transferred to the District of Minnesota and, on August 22, 2023, was voluntarily dismissed by Kahn. *See Kahn v. Target Corp.*, Case No. 0:23-cv-00500-PJS-TNL (D. Minn.); *id.* at Dkt. 73 (Kahn's August 22, 2023 notice of dismissal). This Court may take judicial notice of matters of public record, such as materials from another proceeding. *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 942 (7th Cir. 2012).

### A. State laws around the country acknowledge that pricing errors are to be expected.

Illinois does not have statutes or regulations that directly address the accuracy of Shelf Pricing, but many other states do have such laws. Although these laws vary by jurisdiction, they all have one thing in common—each law recognizes that pricing errors are inevitable. For example, like the ICFA that requires intentionality, California Civil Code § 7103 expressly provides that pricing errors are only unlawful if it is shown that the errors were intentional.

Other state laws contain similar provisions. For example:

- New York law provides that a retailer generally is considered in compliance if 98% of the items are accurately priced. *See* NY Pricing Laws and Regulations § 197-B(3)(b).

- Michigan law requires consumers to notify sellers within 30 days after their purchase if they were overcharged. The seller has two days to remedy the overcharge. If the overcharge is corrected, the consumer is precluded from bringing a lawsuit. Michigan law also contains express limitations on available remedies. *See* Mich. Comp. Laws §§ 445.319, 322, and 324.

- Connecticut law provides that a consumer who is charged a higher retail price than the Shelf Price is entitled to one free item up to a value of $20. *See* R.C.S.A. § 21a-79-7.

- Mississippi and Oklahoma similarly limit available remedies for pricing errors. *See* MS Code § 75-27-51; Okla. Stat. § 2-14-38.

- Florida has adopted a version of the NCWM Handbook standard on price verification. *See* Fla. Stat. § 531.44; s*ee also infra*, Section I.B (discussing the Handbook). In addition, the State of Florida's Department of Agriculture and Consumer Services advises in its FAQs that "[i]f a store's scanner reflects a different price than the posted or advertised

price, [the consumer] should first bring the discrepancy to the attention of the salesclerk or store management."[4]

These state laws, and others like them, recognize that pricing errors are inevitable. Thus, the fact that an individual consumer may have identified a few errors does not provide a sufficient basis upon which to bring a consumer fraud claim, let alone a national class action seeking millions of dollars for a plaintiff and his attorneys.

### B. The United States Department of Commerce similarly recognizes the inevitability of pricing errors.

Like many states, the National Institute of Standards and Technology ("NIST") of the U.S. Department of Commerce has addressed the real-world challenges associated with Shelf Pricing. Specifically, in a handbook adopted by the 106th National Conference on Weights and Measures (the "Handbook"), the Department of Commerce acknowledges that 100% pricing accuracy is not reasonably expected in the retail industry. *See* Dkt. 26-3 (NIST Handbook 130 attached as Ex. B to Walmart's motion to dismiss). To that end, the Handbook expressly recognizes that *"[r]andom pricing errors are to be expected …" Id.* (NIST Handbook 130 at 225) (emphasis added). Notably, the Handbook contains detailed procedures by which state and federal regulators monitor retailer pricing, including sampling methods and sample sizes. *See id.* (NIST Handbook 130 at 211–23). The specific nature of these sampling methods effectively guards against inherent problems when an individual only

---

[4]   *See*   https://www.fdacs.gov/Consumer-Resources/Consumer-Rights-and-Responsibilities/ Weights-and-Measures/What-should-I-do-if-an-item-purchased-at-a-store-scans-at-a-different-price-than-the-posted-or-advertised-price.

identifies a limited, statistically insignificant number of pricing errors, let alone obvious problems if an individual intentionally attempts to cherry-pick certain items as support for a putative national class action.[5]

In the district court, Kahn argued that the Handbook has no legal effect. Although Illinois has not adopted the operative sections of the Handbook,[6] and the Handbook itself is not a law, Kahn's position misses the point. The Handbook is relevant because it highlights the inevitability of pricing errors. Moreover, it undercuts Kahn's apparent position that retailers, including Walmart, should be held strictly liable if Shelf Prices and scanned prices do not match 100% of the time for all products. Like the Handbook, Illinois law requires more. As discussed below, to prevail on the claims asserted here, Kahn must provide sufficient factual allegations that establish deception and intentionality. As the district court correctly concluded, Kahn has failed to do so.

---

[5] "If a store has more overcharges than undercharges …, it may indicate that the store is not following good pricing practices, but enough errors must be present in order to make this determination." *Id*. (NIST Handbook 130 at 225). Kahn's sample set of items purchased from Walmart falls woefully short.

[6] Illinois's legislature has adopted portions of NIST Handbook 44, including G-UR.3.3, the Position of Equipment User Requirement, which requires that a checkout register have a display visible to the customer to accurately read the price being charged for each item at checkout. *See* 225 Ill. Comp. Stat. Ann. 470/30 (adopting NIST Handbook 44); Ill. Admin. Code tit. 8, § 600.330 (same); *see also* Nat'l Inst. of Standards & Tech., U.S. Dep't of Commerce, NIST Handbook 44: Specifications Tolerances, and Other Technical Requirements for Weighing and Measuring Devices § 1.10 (General Code), at G-UR.3.3 (User Requirements, Use Requirements: Position of Equipment) (2023 ed., last updated July 2023), https://doi.org/10.6028/NIST.HB.44-2023-upd1 ("G-UR.3.3. Position of Equipment. – A device or system equipped with a primary indicating element and used in direct sales, except for prescription scales, shall be positioned so that its indications may be accurately read and the weighing or measuring operation may be observed from some reasonable 'customer' and 'operator' position.").

### C. The Illinois appellate court has rejected the notion that pricing perfection is required.

Consistent with the logic underlying the referenced state laws and the Handbook, the Illinois appellate court has rejected the notion that a mere differential between Shelf Prices and the amount charged at checkout is sufficient to state a claim under Illinois law. In *Tudor v. Jewel Food Stores*, 681 N.E.2d 6 (Ill. App. Ct. 1997), the plaintiff alleged that the defendant improperly charged her for several grocery items when the prices scanned at the checkout counter differed from the advertised shelf prices for the purchased items. *Id.* at 209–10. In granting the defendant's motion to dismiss, the court effectively noted that it is virtually impossible for a retailer to have 100% accurate Shelf Pricing—some error is inevitable. *Id.* at 210–11 (the court referenced the Handbook that states, as discussed above, that "[r]andom pricing errors are to be expected …"). The appellate court affirmed the trial court's order dismissing the plaintiff's complaint, finding that the defendant had not engaged in a deceptive or unfair practice just because the prices charged for a few items did not match the shelf pricing. *Id.* The court emphasized that the "defendant issues a receipt, enabling [the defendant] to check whether she has been correctly charged," as establishing there was no intent to deceive. *Id.* at 210.

*Tudor* is the only Illinois appellate court case to address the factual scenario here—an alleged mismatch between the Shelf Price and scanned price for a few items. Although the *Tudor* decision is more than 25 years old, no Illinois appellate court has found to the contrary under similar factual circumstances, before or after. Thus, *Tudor* remains an accurate statement of Illinois law today. *See Dunn v. Menard, Inc.*,

880 F.3d 899, 905 (7th Cir. 2018) ("[S]tate law provides the substantive law in a diversity action. Thus, our task is to predict how the Illinois Supreme Court would decide the issues presented here. Where the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently.") (internal quotation marks and citations omitted). As discussed below, Kahn's suggestion to the contrary is simply wrong.

## II.   The District Court Properly Concluded that the Asserted Claims Require Deception and Intentionality, Neither of Which Has Been Sufficiently Alleged Here.

To state a claim under the ICFA, a plaintiff must allege sufficient facts to show that: "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." *CHS Acquisition Corp. v. Watson Coatings, Inc.*, No. 17-CV-4993, 2018 WL 3970137, at *12 (N.D. Ill. Aug. 20, 2018) (quoting *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015)). Similarly, to plead a viable claim under the UDTPA a plaintiff must allege sufficient facts to establish that the defendant engaged in an unfair or deceptive act.[7] *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997) (for a claim to be actionable under the twelve enumerated subsections of § 2 of the UDTPA, the defendant must make a "false, misleading, or

---

[7] Complaints alleging fraud-based claims, like the ones presented here, "must be pled with the same particularity and specificity as that required under common law fraud." *Toulon v. Cont'l Cas. Co.*, 2016 WL 561909, at *5 (N.D. Ill. Feb. 12, 2016) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996)); *Pirelli*, 631 F.3d at 441.

– 11 –

deceptive" representation) (discussing 815 ILCS 510/2(a)(1)–(12)); *Kljajich v. Whirlpool Corp.*, 2015 WL 12838163, at *4 (N.D. Ill. Sept. 25, 2015) (St. Eve, J.) (explaining the UDTPA "prohibits deceptive trade practices and unfair competition" and to obtain relief under the UDTPA, "a plaintiff must demonstrate that a defendant engaged in any of twelve enumerated types of deceptive conduct listed in Section 510/2").

As the district court properly concluded, Kahn must allege more than a price discrepancy to state a claim. SA39–41. A price discrepancy, standing alone, shows nothing more than a mere error—it is not evidence of a deceptive act, let alone that a defendant intended consumers to rely on inaccurate Shelf Prices. If a plaintiff were permitted to state a claim based simply on identifying a price discrepancy, the standard would change from an intentional act to strict liability. But Kahn identifies no Illinois statute, regulation or judicial case that requires perfection in this area.[8] And Kahn provides absolutely no basis upon which to conclude that the expressly stated requirement of deception in the ICFA and UDTPA can or should be ignored. *See Bread Pol. Action Comm. v. FEC*, 455 U.S. 577, 580 (1982) ("Statutory construction 'must begin with the language of the statute itself,' and 'absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" (citations omitted)); *United States v. Sanders*, 688 F. Supp. 367, 370 (N.D. Ill. 1988) (holding that courts "can only ignore the language of the

---

[8] As discussed above, *supra*, Section I, pricing perfection is neither expected nor required in Illinois or anywhere else in the country.

statute itself if there is a clear legislative intention to the contrary") (emphasis omitted); *Hickey v. Schomig*, 240 F. Supp. 2d 793, 795 (N.D. Ill. 2002) (same).

### A. The Complaint does not contain sufficient facts to establish that Walmart engaged in a deceptive act.

Other than the conclusory allegation that pricing errors are a "deceptive act," the Complaint contains no factual assertions to support that proposition, let alone factual allegations sufficient to satisfy Rule 9(b)'s heightened pleading requirement. And Kahn's cross-reference to subsections of the UDTPA is completely misplaced. Opening Br. at 14.[9]

The judicial authority addressing Subsection 2(a)(9) makes clear that it only applies to "bait-and-switch" cases. *See, e.g., Williams v. Bruno Appliance and Furniture Mart*, 379 N.E.2d 52, 54 (Ill. App. Ct. 1978) (recognizing that Subsection 2(a)(9) applies to bait-and-switch advertising, which occurs with "alluring but insincere offer to sell a product or service which the advertiser in truth does not intend or want to sell. Its purpose is to switch customers from buying the advertised merchandise, in order to sell something else, usually at a higher price or on a basis more advantageous to the advertiser." (quoting 16 C.F.R. § 238.0)). And the commentary from the drafters of the UDTPA makes clear that the cross-referenced

---

[9] Similarly, Kahn misconstrues 815 ILCS 505/2J.2 in arguing that it "further demonstrat[es] the Illinois legislature's intent that consumers be presented with accurate pricing information before they reach checkout and that they be able to rely on such price displays as accurate." Opening Br. at 14 n.2. That statute does not make any mention of pricing accuracy, let alone the "legislature's intent" surrounding pricing accuracy. Indeed, the statute solely references whether the pricing for an item need be placed in close proximity or directly on an individual item.

sections do not apply to Kahn's claims.[10] The UDTPA Commentary explains that Subsection 2(a)(9)—which prohibits "advertis[ing] goods or services with intent not to sell them as advertised"—deals with "bait advertising."[11] Addendum A (UDTPA Commentary at 14). Kahn presents no such allegations in his Complaint. And not surprisingly, Kahn cites no case involving a court applying subsection 2(a)(9) where a retailer mistakenly fails to match a Shelf Price to the amount charged at checkout.

Similarly, Subsection 2(a)(11)—which prohibits "mak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions"—deals with "spurious 'fire' and 'liquidation' sales" and "fictitious price cuts." *Id.* (UDTPA Commentary at 15). Kahn does not cite any case applying Subsection 2(a)(11), much less in the context of shelf pricing. This is not a case involving allegedly false statements concerning price reductions. *See, e.g., Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (analyzing seller's allegedly deceptive practice of advertising normal retail prices as temporary price reductions).

---

[10] The original source of the language in 815 ILCS 510/2(a)(9), (11), and (12) came from Sections 2(a)(9), (11), and (12) of the Uniform Deceptive Trade Practices Acts of 1964 and 1966. In 1966, the drafters of the UDTPA, the National Conference of Commissioners on Uniform State Laws on the Uniform Deceptive Trade Practices Act, provided commentary on the UDTPA to ensure uniformity in its application (the "UDTPA Commentary"). The UDTPA Commentary is attached hereto as Addendum A. Given the identical legislative drafting between 815 ILCS 510/2(a)(9), (11), and (12) and Sections 2(a)(9), (11), and (12) of the UDTPA, it is appropriate for this Court to consider the UDTPA Commentary as reflecting the intended meaning of these proscribed provisions.

[11] "Bait advertising" is "a practice by which a seller seeks to attract customers through advertising at low prices products which he does not intend to sell in more than nominal amounts. When prospective buyers respond to the advertisement, sale of the "bait" is discouraged through various artifices including disparagement and exhaustion of a minuscule stock in order to induce purchase of unadvertised goods on which there is a greater markup." Addendum A (UDTPA Commentary at 14).

In sum, this Court should reject Kahn's attempt to shoehorn a situation involving incorrect Shelf Prices into clearly inapplicable statutory provisions. Similarly, the Court should reject Kahn's reliance on Subsection 2(a)(12) as a UDTPA "catch-all" provision. As addressed below, the district court properly analyzed the totality of information made available to Kahn and correctly held that Walmart did not intend to deceive consumers, nor would a reasonable consumer have been deceived. SA37–41.

### B. Walmart did not intend for its customers to rely on incorrect shelf pricing and reasonable consumers would not have been misled.

Allegedly deceptive acts "must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005). The district court appropriately applied this standard. *See* SA39 ("the Court considers the allegedly deceptive act 'in light of the totality of the information made available to the plaintiff'" in determining whether conduct is deceptive (citing *Davis*, 396 F.3d at 884)). In doing so, the court also appropriately considered the thorough analysis provided in the *Tudor* case, which is the only Illinois appellate court decision directly on point.

Like the situation presented in *Tudor,* Kahn received a receipt from which he could compare the scanned price with the Shelf Price. SA39. The district court appropriately concluded that Kahn could have used, and indeed did use, the receipt to compare the Shelf Prices to the amounts charged. SA40. Moreover, although not

addressed in the district court opinion, Kahn cannot credibly contend that he was unable to cross-check the prices as items were being scanned during checkout.[12]

Similarly, unlike the situation presented in *Gohari v. McDonald's Corp.*, No. 2016-CH-08261, 2017 WL 11676255, at *1–2 (Ill. Cir. Ct. Cook Cnty. July 13, 2017), a case cited in Kahn's opening brief (*see, e.g.*, Opening Br. at 16, 24–25) and further addressed below, Kahn does not allege that Walmart refused to correct any pricing errors. And Kahn has not alleged that he was in any way precluded from bringing the pricing errors to the attention of the salesclerk or store manager at the time of checkout, or that the incorrectly charged amounts would not have been refunded.[13] Thus, contrary to Kahn's contentions, the district court properly relied on the reasoning in *Tudor*, rightfully considered the totality of circumstances, and correctly held that Kahn failed to plausibly allege a violation of the ICFA or UDTPA.

In challenging the district court's ruling, Kahn relies heavily on *Gansberg v. Kroger*, No. 2022-CH-08071 (Ill. Cir. Ct. Cook Cnty. Apr. 7, 2023), attached in Addendum A to Kahn's opening brief. *See, e.g.*, Opening Br. at 17, 22–24. This case, however, is factually distinguishable and, more importantly, it does not supplant the Illinois appellate court's thorough and well-reasoned *Tudor* decision. *See Dunn*, 880

---

[12] Consistent with Illinois law, when Walmart items are scanned at check out, their prices are displayed on screens viewable by Walmart customers. *See* discussion concerning the Position of Equipment User Requirement in NIST Handbook 44, *supra* n.6 (noting Illinois's legislature has adopted this requirement).

[13] It should not be lost on this Court that Kahn omitted any reference in his Complaint to Walmart's pricing and refund policies. Walmart respectfully submits that the Court should not reward plaintiffs' attorneys with wide-sprawling class action lawsuits against retailers that cannot be resolved until summary judgement solely because they omitted reference to a relevant pricing policy in their complaint.

F.3d at 905 ("[w]here the Illinois Supreme Court has not ruled on an issue, decisions of the Illinois Appellate Courts control" this Court's application of state substantive law, "unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently") (internal quotation marks and citation omitted). One distinguishable circuit court decision decided less than six months ago is not a persuasive reason to ignore decades of good law.

In *Kroger*, the plaintiff alleged that the Shelf Prices did not match the amounts the defendant grocery store charged her at checkout. Opening Br. at Addendum A ¶ 1. That is where the arguable similarities to the present case end. The plaintiff in *Kroger* alleged that whenever she caught an overcharge she would "'attempt to convince the store to charge the correct price.'" *Id.* She also alleged that on at least four occasions she brought these overcharges to Kroger's attention, but Kroger refused to provide a refund unless she affirmatively established the existence of the overcharge. *Id.* Although the trial court's analysis of the relevant issues is limited to two paragraphs (*see id.* ¶¶ 2–3), it appears that these facts were critical to the court's determination that plaintiff sufficiently alleged the existence of an unfair or deceptive act.[14]

Unlike the plaintiff in *Kroger*, Kahn does not allege that he brought the alleged overcharges to Walmart's attention, let alone that Walmart made him jump through any hoops before it would agree to provide a refund. Instead, Kahn went to the courthouse to file a putative class action seeking millions of dollars in compensation.

---

[14] Notably, the court's short order did not address whether it applied a heightened pleading standard for fraud-based claims that applies here.

Kahn also found time to stop by a local Target store to purchase items as the basis for his virtually identical lawsuit against Target.

Going even farther afield, Kahn cites *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th Cir. 2019), to support that a consumer can be deceived even if he or she is provided with a receipt. Opening Br. at 17, 25. *Benson* is not even close to the facts at issue here because it deals with alleged deception regarding the amount of product purchased, not the advertised price. In *Benson*, the plaintiff alleged that the nonfunctional slack-fill in Fannie May's opaque packaging was deceptive because it caused consumers to believe that the boxes contained more chocolate than they otherwise would assume. 944 F.3d at 646. Plaintiff also alleged that reasonable consumers rely on the *size* of the packaging to infer the quantity of the product, so any extra slack-fill misleads consumers. *Id.* The defendant countered that the information on the outside of the box and on the receipt eliminated the possibility that a reasonable consumer would be deceived about the amount of product because the box disclosed the net weight and number of chocolates inside the box, and the receipt disclosed the weight and price of the box. *Id.* at 646–47. In denying defendant's motion to dismiss, the court stated it "cannot conclude that the information on the boxes is enough as a matter of law to avoid a finding of deception," especially given the fact that plaintiff alleged that "[t]he Food and Drug Administration takes the position that 'the presence of an accurate *net weight* statement does not eliminate the misbranding that occurs when a container is made, formed, or filled so as to be misleading.'" *Id.* (citing FDA regulations about misleading

containers and nonfunctional slack-fill codified at 21 C.F.R. pt. 100) (emphasis added).

Kahn's citation to *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 673 (7th Cir. 2015) is also inapposite. Opening Br. at 15. The issue in *Mullins* had nothing to do with purported misrepresentations regarding Shelf Prices or whether the plaintiff alleged sufficient facts to establish the requisite elements of deception or intent under the ICFA. Instead, the issue this Court addressed was whether "ascertainability" must be established for a class to be certified. 795 F.3d at 673.

Similarly, Kahn's citation to *Kim v. Carter's Inc.*, 598 F.3d 362 (7th Cir. 2010) is misplaced (*see* Opening Br. at 16) because that case did not involve an alleged mismatch between Shelf Prices and the prices charged at checkout. Instead, *Carter's* involved a retailer's alleged misrepresentations about price discounts. 598 F.3d at 364–65. The retailer purportedly listed fake "suggested prices" on its product tags that were higher than the regular prices charged for the products and advertised discounts off the fictitious prices, leading customers to believe they were getting a discount. *Id.* And the issue before the Court was not whether plaintiffs' ICFA claim failed for lack of a deceptive act, but whether it failed for lack of actual damages. *Id.* at 365.

Next, Kahn argues that the Court should only consider information available to the consumer before the alleged fraud occurs. Opening Br. at 8, 21. Applicable case law, however, does not draw the temporal line Kahn suggests. For example, in *Tudor*, the Illinois appellate court affirmed dismissal of the complaint in part because the

receipt issued *at the time of purchase* accurately reflected the price charged. *Tudor*, 681 N.E.2d at 8–9 Similarly, in *Killeen v. McDonald's Corp.*, 317 F. Supp. 3d 1012, 1013 (7th Cir. 2018), this Court stated that "even assuming defendants' marketing of the Extra Value Meal had a tendency to mislead consumers . . . Illinois law is clear that where *other* information is available to dispel that tendency, there is no possibility for deception" (emphasis added). *See also Saunders v. Mich. Ave. Nat. Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996) (affirming dismissal of ICFA claim against bank for allegedly hiding an overdraft fee, because the bank "eliminated any confusion concerning overdraft charges by providing Saunders with pamphlets which expressly stated that [the bank] would charge $20 per day for overdrafts," regardless of whether that information was buried in the pamphlets). These cases demonstrate that courts should properly consider all information available to consumers, irrespective of whether the information is made available before, during, or after the challenged transaction.

Even if Kahn's position were an accurate statement of the law (and it is not) Kahn had the ability to compare the Shelf Prices against the amounts scanned at checkout before he paid for the items in question. Illinois law mandates that consumers be able to see the amount scanned at checkout. *See* NIST Handbook 44, *supra* n.6. This step necessarily precedes payment for the scanned items. *See Camasta*, 761 F.3d at 736 ("Determining whether a complaint states a claim upon which relief may be granted is dependant [*sic*] upon the context of the case and 'requires the reviewing court to draw on its judicial experience and common sense.'") (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 679 (2009)). Thus, Kahn's assertion that he "cannot possibly have learned . . . that he was deceived—or for which items—until *after* he completed his purchase" is incorrect. Opening Br. at 21.

Likewise, Kahn's contention that the district court applied the incorrect standard regarding "intent" is simply wrong. Opening Br. at 28. Kahn cites *Chow v. Aegis Mortg. Corp.*, 286 F. Supp. 2d 956, 963 (N.D. Ill. 2003) as setting forth the appropriate "correct" standard for intent under the ICFA. Opening Br. at 28–29. In fact, the district court also cited *Chow* when analyzing the adequacy of Kahn's allegations regarding intent. SA40.

Under the standard articulated in *Chow*, the district court correctly held that Kahn has not pled sufficient facts to satisfy the intent element. SA40–41. In doing so, the district court reasoned that "in light of the fact that Walmart provided Kahn with a receipt against which he could, and indeed did, compare the shelf price to the scanned price to determine if they differed, the Court cannot find that Walmart intended for Kahn to rely on the incorrectly scanned price." SA40–41. The district court explained that, while the same combination of facts in *Tudor* was not alleged here, the logic and reasoning in *Tudor* supported the district court's finding that Walmart did not intend for Kahn to rely on incorrect shelf pricing. SA41 n.4. The district court based this conclusion on a combination of facts, including that: (i) "Kahn received a receipt identifying the prices Walmart charged him for the items he purchased"; (ii) this receipt allowed Kahn "to identify any discrepancies between the scanned and shelf prices"; and (iii) if a discrepancy was identified because of the

receipt, Kahn could "raise any such discrepancies with Walmart." SA41 n.4. Taken together, these facts support the district court's conclusion regarding Walmart's lack of intent that Kahn rely on an inaccurate Shelf Price.

Kahn argues that the district court got it wrong, pointing only to his conclusory allegation that Walmart intends for consumers to rely on its allegedly deceptive shelf pricing in choosing which items to purchase, and that consumers (including Kahn) reasonably rely on Walmart's shelf pricing to make such decisions. Opening Br. at 7, 30. Once again, Kahn presents no facts to support his assertion. Instead, he in effect argues that Shelf Pricing errors should be treated as strict liability offenses. The Illinois Attorney General—who filed an amicus brief in support of Kahn—said the quiet part out loud: "the intention of the seller—his good or bad faith—is not important," Amicus Br. at 13 (citing *Am. Buyers Club of Mt. Vernon, Ill., Inc. v. Honecker*, 361 N.E.2d 1370, 1374–75 (Ill. App. Ct. 1977)).

Contrary to Kahn's and the State's position, the district court properly read the express language of the statute and correctly concluded that intent is a requisite element of an ICFA claim. SA40–41. Kahn has not alleged sufficient facts regarding this requisite element, and accordingly, his claim cannot stand.

### III.    Kahn's "Unfairness" Claim Is Similarly Defective.

Kahn alternatively argues that he adequately pled a viable claim under the unfairness prong of the ICFA. He is wrong for several reasons.[15]

---

[15] Contrary to Kahn's assertion, Walmart has not waived any arguments with respect to the "unfairness" prong of the ICFA. As Kahn notes in his opening brief, Walmart "discuss[ed] the pleading standard" for the claim in its reply brief. Opening Br. at 34 n.11. As such, the issue was fairly presented in and decided by the district court, and thus is preserved and

Throughout his Complaint Kahn consistently and repeatedly uses the conjunctive phrase "unfair and deceptive" when describing Walmart's business practices. He does not differentiate between alleged "unfair" practices vs. "deceptive" practices.[16]

Recognizing this fact, the district court explained that "[a]lthough Kahn uses language of unfairness in his complaint, he premises his ICFA claim on Walmart's alleged concealment of the actual prices of its items, and so the Court interprets it solely as a deceptive practices claim that must meet Rule 9(b)'s heightened pleading standard." SA38. This Court has repeatedly endorsed the sort of claim conversion the district court conducted here. *See Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) ("Although Haywood brings one ICFA claim alleging unfair practices, that claim still sounds in fraud because it relies upon the same baseline allegation that Massage Envy intentionally misled consumers by hiding information on the length of massage time."); *Jos. A. Bank*, 761 F.3d at 737 (addition of "unfairness" language did not change ICFA claim "entirely grounded in fraud" to an unfairness claim); *Pirelli*, 631 F.3d at 446–47 (pleading premised on intentional concealment appropriately interpreted as deceptive practices claim subject to Rule

_____

reviewable on appeal. In any event, this Court can affirm the district court's dismissal of Kahn's unfair practices claim on any basis supported by the record. *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 332–33 (7th Cir. 2018) ("We 'may affirm the district court's dismissal on any ground supported by the record, even if different from the grounds relied upon by the district court.'") (quoting *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001)).

[16] The only assertion even arguably tied to "unfair" practices is paragraph 69 of the Complaint, in which Kahn states: "Defendant's actions offend an established public policy, and are immoral, unethical, oppressive, and unscrupulous, and are and were substantially injurious to consumers." Noticeably absent are any factual allegations to support this conclusory allegation. *Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation.").

9(b), not unfair practices claim subject to Rule 8's general pleading rules). As discussed above, Kahn fails to provide sufficient factual support under Rule 9(b) to establish the requisite elements of deception or intentionality. Thus, his ICFA and UDTPA claims cannot stand—regardless of whether they are couched in terms of "unfair" or "deceptive" practices.

Kahn's "unfairness" claim is defective even under Rule 8's more lenient pleading standard. To state a viable unfair practice claim under the ICFA, Kahn must establish, among other things, that Walmart engaged in an unfair practice and intended Kahn to rely on the unfair practice. *Robinson*, 775 N.E.2d at 960. To determine whether an act is unfair, courts look to three factors: "(1) whether the [allegedly unfair] practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and/or] (3) whether it causes substantial injury to consumers." *Benson*, 944 F.3d at 647. Kahn argues that he has sufficiently pled all three factors. Opening Br. at 34. He has not.

Kahn relies on an Illinois trial court opinion, *Gohari v. McDonald's Corp.*, No. 2016-CH-08261, 2017 WL 11676255 (Ill. Cir. Ct. Cook Cnty. July 13, 2017), as support for his position that the allegations in the Complaint sufficiently establish a practice that offends public policy or is otherwise unscrupulous. But the *Gohari* decision involved undisputed intentional conduct, a refusal by a retailer to fix a price discrepancy, and a customer under time and location constraints to make a purchase.

In *Gohari*, the plaintiff had a short layover at O'Hare airport. In part due to a medical condition that required her to eat breakfast at a consistent time each day,

plaintiff went to a McDonalds at the airport to purchase breakfast. After waiting in line for 15 to 20 minutes, she ordered food and was charged more than the price advertised on the display menu. The Illinois trial court held that plaintiff alleged sufficient facts to establish an unfair business practices claim, in part, because she alleged that the employee stated that McDonald's knew the menu boards were wrong and would not fix it or charge her the prices advertised. *Id.* at *6. The court further explained:

> Airports are limited venues with stringent time constraints and generally less flexibility. A customer chooses a restaurant in the airport for these reasons, along with others, including brand familiarity. A customer that chooses a restaurant and waits in line to order their food may feel like they have no choice but to order from that restaurant because they already spent their time waiting there. Allegations that an airport restaurant not only advertised wrong prices, but did so intentionally, with no plan to change the advertisement in the future, could be considered to be unfair and oppressive. *Id.*

Unlike the situation presented in *Gohari*, Kahn does not allege he had limited choices, either because of time constraints or available stores at which he could shop. He also does not allege that the choice of products available at Walmart was limited, that any such limitation impacted his purchase decisions, or that any price differential between otherwise available products impacted his purchase decision in any way. *Gohari* involves facts completely different than those presented here.

Kahn's last argument—that Walmart should be held liable because it is a large retailer—similarly misses the mark. Walmart's size is, at most, only one of many factors the court could consider. As discussed at length above, pricing errors are inevitable. Here, Kahn must establish, among other things, that Walmart engaged in

a deceptive or unfair act and that Walmart intended for him to rely on the allegedly misrepresented Shelf Prices. As the district court correctly noted, other than the fact of an allegedly incorrect Shelf Price, Kahn's Complaint does not contain any factual allegations to establish these requisite elements.

## IV.    The District Court Properly Dismissed the UDTPA Claim.

The UDTPA, like the ICFA, requires deceptive conduct. *See* 815 Ill. Comp. Stat. 510/2; *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997). As addressed above, the district court properly concluded that Kahn failed to satisfy his burden in this regard. For this reason alone, the district court's judgment as to Kahn's UDTPA claim should be affirmed.

Kahn's UDTPA claim also fails because he has not plausibly alleged that Walmart's conduct will likely cause him harm in the future. *See* 815 ILCS 510/3; *Camasta*, 761 F.3d at 740. This Court and others, including several cases cited by Kahn in his opening brief, consistently have found that an individual already aware of a defendant's allegedly deceptive practices will not likely be deceived by those practices in the future. *See Camasta*, 761 F.3d at 740–41. ("Since [the plaintiff] is now aware of [the defendant's] sale practices, he is not likely to be harmed by the practices in the future."); *see also Benson v. Fannie May Confections Brands*, *Inc.,* 2018 WL 1087639, at *5 (N.D. Ill. 2018) (explaining that if a plaintiff is "already aware of [the defendant's] alleged deceptive practices, [the plaintiff] cannot claim [he] will be deceived again in the future"); *Ulrich v. Probalance, Inc.*, 2017 WL 3581183, at *7 (N.D. Ill. Aug. 18, 2017) (dismissing request for injunctive relief in part because if

plaintiff had reason to suspect that defendant's purportedly deceptive trade practices tainted multiple products, plaintiff could simply stop shopping there).

Kahn's citation to authority that runs counter to this Court's decision in *Camasta* misses the mark. First, *Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1109 (E.D. Wisc. 2016), did not involve a claim under the UDTPA. Beyond that, *Le* is an outlier that is in direct conflict with numerous cases in this Circuit, which have found this Court's reasoning in *Camasta* more compelling. *See, e.g.*, *Ulrich*, 2017 WL 3581183, at *7 (specifically addressing that *Le* dismissed *Camasta* as *dicta*, but still "find[ing] the Seventh Circuit's reasoning compelling, regardless of whether it is dicta"); *In re Herbal Supplements*, 2017 WL 2215025, at *8 ("Even if *Camasta* were *dicta*, as the court found in [*Le*], it is persuasive.").

Next, *Van Zeeland v. Rand McNally*, 532 F. Supp. 3d 557 (N.D. Ill. 2021), is not about inaccurate shelf prices but misrepresentations made about the condition of a defective electronic tablet that the plaintiff alleged he would not have purchased had he known of the product's persistent issues. Finally, although *Gansberg v. Kroger*, No. 2022-CH-08071 (Ill. Cir. Ct. Cook Cty. Apr. 7, 2023), at least involves alleged inaccurate Shelf Pricing, it is distinguishable based on significantly different facts. In addition to those addressed *supra*, section II.B, in *Kroger* the plaintiff alleged that the defendant's stores regularly offered discounts on certain grocery items making them less expensive than competitors' items. The plaintiff further alleged that, accordingly, Kroger could not assert that plaintiff and class members can merely shop

at a different store to avoid damages, as they would end up paying more for certain items. *Kroger*, No. 2022-CH-08071, ¶ 3 (quoting allegations in *Kroger* complaint).

Here, by contrast, Kahn does not allege that prices at other retailers are likely to be higher—because Walmart typically offers significant discounts. Kahn also does not allege that he has no choice but to continue shopping at Walmart because shopping elsewhere will inevitably cost him more. *See generally* Compl. ¶¶ 1–119 (SA6–33); *see also* Compl. ¶¶ 97–107 (SA 29–30) (allegations for UDTPA count). Thus, unlike the situation presented in *Kroger*, Kahn failed to sufficiently allege a risk of future harm. For this additional reason the district court properly dismissed the UDTPA claim.

## V.     The Unjust Enrichment Claim Cannot Stand.

Unjust enrichment "is not a separate cause of action under Illinois law." *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019). If an unjust enrichment claim rests on the same conduct alleged in another claim—as Kahn has done here—the "unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.,* 656 F.3d 511, 517 (7th Cir. 2011); *Robinson v. Walgreen Co.,* 2022 WL 204360, at *8 (N.D. Ill. 2022). As discussed above, the district court correctly dismissed Kahn's claims for multiple reasons, including the absence of any deception on the part of Walmart. Accordingly, Kahn's unjust enrichment claim similarly fails.

## VI.     The District Court Properly Dismissed Each of the Asserted Claims *With Prejudice*.

Kahn did not request leave to amend his Complaint in the district court nor has he done so in this Court. Moreover, Kahn has not challenged on appeal the district court's ruling that any attempt to amend the Complaint would be futile. Accordingly,

Kahn has waived any right he may have had to request amendment of the Complaint. *See Gagan v. Am. Cablevision, Inc.*, 77 F.3d 951, 965 (7th Cir. 1996) (failure to cite any factual or legal basis for an argument waives it); *Bratton v. Roadway Package Sys., Inc.*, 77 F.3d 168, 173 n.1 (7th Cir. 1996) (holding that an argument that is not developed in any meaningful way is waived).

But even if he had, the district court did not abuse its discretion in dismissing the Complaint with prejudice. Although Federal Rule of Civil Procedure 15(a) takes a liberal approach to granting leave to amend, "[n]othing in Rule 15, nor in any of [this Court's] cases, suggests that a district court must give leave to amend a complaint where a party does not request it or suggest to the court the ways in which it might cure the defects." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Board of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021) (quoting *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) ("[W]e have held that courts are within their discretion to dismiss with prejudice where a party does not make such a request or showing")); *Fosnight v. Jones*, 41 F.4th 916, 925 (7th Cir. 2022) ("A plaintiff should 'offer [a] meaningful indication of how [he] would plead differently.' . . . Without such a showing, the court is 'within its discretion to dismiss with prejudice.'") (citations omitted).

## CONCLUSION

For the foregoing reasons, the district court correctly found that Kahn failed to sufficiently plead any of the asserted claims and that any attempt to amend would be futile. This Court should affirm the judgment of the district court.

Dated: September 15, 2023

Respectfully submitted,

/s/ *Daniel M. Blouin*

Daniel M. Blouin
    *Counsel of Record*
Frank A. Battaglia
Monica T. Kociolek
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600 (phone)
312-558-5700 (fax)
DBlouin@winston.com
FBattaglia@winston.com
MKociolek@winston.com

*Counsel for Appellee Walmart Inc.*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Appellee Walmart Inc., furnishes the following in compliance with Federal Rule of Appellate Procedure 32 and Seventh Circuit Rule 32:

I hereby certify that this brief conforms to the rules contained in Seventh Circuit Rule 32 for a brief produced with a proportionally spaced font. The length of this brief is 9,584 words.

Dated: <u>September 15, 2023</u>

<u>/s/ *Daniel M. Blouin*</u>

Daniel M. Blouin
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600 (phone)
312-558-5700 (fax)
DBlouin@winston.com

*Counsel for Appellee Walmart Inc.*

## CIRCUIT RULE 30(D) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) is included in the Appendix.

Dated: <u>September 15, 2023</u>

<u>/s/ *Daniel M. Blouin*</u>

Daniel M. Blouin
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
312-558-5600 (phone)
312-558-5700 (fax)
DBlouin@winston.com

*Counsel for Appellee Walmart Inc.*

## CERTIFICATE OF SERVICE

I certify that on September 15, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By:    */s/ Daniel M. Blouin*
           Daniel M. Blouin

           *Counsel for Defendant-Appellee*
           *Walmart Inc.*

# ADDENDUM A

# REVISED UNIFORM DECEPTIVE TRADE PRACTICES ACT

Drafted by the

## NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS

and by it

## APPROVED AND RECOMMENDED FOR ENACTMENT IN ALL THE STATES

at its

## ANNUAL CONFERENCE
## MEETING IN ITS SEVENTY-FIFTH YEAR
## MONTREAL, CANADA
## JULY 30 – AUGUST 5, 1966

*WITH PREFATORY NOTE AND COMMENTS*

Approved by the American Bar Association at its Meeting in
Montreal, Canada, August 9, 1966

# REVISED UNIFORM DECEPTIVE TRADE PRACTICES ACT

**The Committee which acted for the National Conference of Commissioners on Uniform State Laws in preparing the Revised Uniform Deceptive Trade Practices Act was as follows:**

G. M. FULLER, 2500 First National Bank Bldg., Oklahoma City, Oklahoma, *Chairman*
THOMAS D. GRAHAM, 235 East High St., Jefferson City, Mo.
CHARLES S. HANSON, Supreme Court, Pierre, So. Dak.
JOHN W. WADE, Vanderbilt University School of Law, Nashville, Tenn.
ROBERT BRAUCHER, Langdell Hall, Harvard Law School, Cambridge, Mass.,
    *Chairman, Section A, Ex-Officio*


RICHARD F. DOLE, JR., University of Iowa Law School, Iowa City, Iowa, *Draftsman*


Copies of all Uniform and Model Acts and other printed matter issued by the Conference may be obtained from

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS
1155 East Sixtieth Street
Chicago, Illinois 60637

# UNIFORM DECEPTIVE TRADE PRACTICES ACT

PREFATORY NOTE

**Reasons for Proposed Uniform Act**

Deceptive conduct constituting unreasonable interference with another's promotion and conduct of business is part of a heterogeneous collection of legal wrongs knows as "unfair trade practices." This type of conduct is notoriously undefined. Commonly referred to as "unfair competition," its metes and bounds have not been charted. The tort action for deceptive trade practices or "passing off" developed from the common-law action for trademark infringement. It embraced imitation of fanciful and coined marks and names as well as those which had developed trade significance but did not qualify technically as trademarks. The action was historically available whenever one trader diverted patronage from a rival by falsely representing that his goods were the goods of his rival. This common-law notion of passing off reached its highest development in the federal courts.

The gradual expansion of passing off by the federal courts came to an abrupt halt in 1938 with *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). By the stroke of a pen the "liberal" federal diversity cases were deprived of binding effect in the very courts which had decided them. Federal judges were thereafter required to apply state law whenever they obtained jurisdiction of an unfair competition claim. The rub was that state law had marked time during the period that federal law was evolving. It varied from state to state and within the confines of a single federal circuit. Judge Medina has referred to distillation of the appropriate state law as an area "where angels fear to tread." He concluded: "Since most cases involve interstate transactions, perhaps some day the much needed federal statute or uniform laws on unfair competition will be passed." *American Safety Table Co. v. Schreiber*, 269 F.2d 255, 271 (2d Cir. 1959).

In 1958 the Section of Patents, Trademark and Copyright Law of the American Bar Association passed a resolution which stated that "there should be uniformity in the law of unfair competition among the respective states." The National Conference of Commissioners on Uniform State Laws began drafting the present proposed Uniform Act as a result of this resolution. At the same time, the Association of the Bar of the City of New York working with Congressman (now Mayor) Lindsey proposed federal legislation and this Bill has been introduced in the Congress several times but it has not been enacted. The Uniform Deceptive Trade Practices Act, on the other hand, promulgated by the National Conference in 1964 and approved by the American Bar Association in the same year, has been enacted

by Connecticut, Delaware, Idaho, Illinois, and Oklahoma.  As Judge Medina has indicated, since most cases involved interstate transactions, the need for uniformity is great.  Since the provisions of the Lindsey Bill and of the Uniform Act are sufficiently similar, the main question is the route by which uniformity is obtained – voluntary adoption by the state legislatures or by a federal act imposing a particular rule on the states.  Although Congress has not responded to the request for federal uniformity, several state legislatures have enacted the Uniform Act and others are actively considering it.

**What the Proposed Act Does**

The Uniform Act is designed to bring state law up to date by removing undue restrictions on the common law action for deceptive trade practices.  Certain objectionable practices are singled out, but the courts are left free to fix the proper ambit of the act in case by case adjudication.

The Uniform Act provides a private conjunctive remedy to persons likely to suffer pecuniary harm for conduct involving either misleading identification of business or goods or false or deceptive advertising.  The amendment introduced by the National Conference in 1966 and approved by the American Bar Association authorizes the court to award reasonable attorney's fees to the plaintiff if the person charged with a deceptive trade practice has willfully engaged in the practice knowing it to be deceptive.  By the same token, it awards reasonable attorney's fees to the defendant in an action if the party complaining of a deceptive trade practice brings his action knowing it to be groundless.

The deceptive trade practices singled out by the Uniform Act can be roughly subdivided into conduct involving either misleading trade identification or false or deceptive advertising.  The principal state laws relating to trade identification are trademark registration statutes which supplement the common-law protection of registered marks through provisions for additional private remedies and procedural advantages.  E.g., N.Y. Gen. Bus. Law art. 24 (Supp. 1963); see Note, "Statutory Treatment of the Model State Trademark Bill," 27 Geo. Wash. L. Rev. 353, 354-56 (1959).  On the other hand, a businessman was not generally subject to common-law liability to a fellow tradesman for false or deceptive advertising.  *Ely-Norris Safe Co. v. Mosler Safe Co.*, 7 F. 2d 603 (2d Cir. 1925), rev'd on other grounds, 273 U.S. 132 (1927).  State legislative modification of the common law has been piecemeal and uncoordinated with an emphasis upon public remedies.  See Note, "The Regulation of Advertising," 56 Colum. L. Rev. 1019, 1057-58 (1956).  Most of the older legislation, characterized by criminal sanctions, has seldom been enforced.  See *id.* at 1058-65 (1956).  More recently some state attorneys general, e.g., N.J. Stat. Ann. §§ 56:8-1-56:8-12 (Supp. 1963); N.Y. Gen. Bus. Law art. 22-A

(Supp. 1963), and a few state administrative agencies, e.g., Wis. Stat. Ann. § 100.20 (1957) & (Supp. 1963), have been given broader powers to act against deceptive advertising, but there remains ample justification for a private action. See Restatement (Second), Torts § 712 (Tent. Draft No. 8, 1963; ATRR 133:A-3 (1/28/64) (remarks of Professor Glen E. Weston).

Although there are several state statutes which reflect aspects of the Uniform Act, Cal. Civ. Code § 3369 (Supp. 1963) represents a rough prototype. The California statute provides in part:

2. Any person performing or proposing to perform an act of unfair competition within this State may be enjoined in any court of competent jurisdiction.

3. As used in this section, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, untrue or misleading advertising and any act denounced by Business and Professions Code of Sections 17500 to 17535, inclusive.

The pertinent conduct condemned by the Business and Professions Code includes making statements in connection with the sale of goods or services which are known or should be known to be untrue or misleading, and advertising goods or services without intent to sell them as advertised, Cal. Bus. & Prof. Code § 17500; stating that a person is a producer, manufacturer, processor, wholesaler, or importer, or that he owns or controls a factory or other source of supply of goods when that is not a fact, or otherwise misrepresenting the character, extent, volume, or nature of a business, Cal. Bus. & Prof. Code § 17505 (Supp. 1963); misrepresenting that goods are the product of blind workers, Cal. Bus. & Prof. Code § 17520; advertising second-hand, used, defective, "seconds," blemished, or rejected merchandise without disclosure of the fact, Cal. Bus. & Prof. Code § 17531; marketing unassembled toys without disclosure of the fact, Cal. Bus. & Prof. Code § 17531.1; advertising of federal surplus property without disclosure of the fact, Cal. Bus. & Prof. Code § 17531.5; knowingly advertising coal under other than its true name or description, Cal. Bus. & Prof. Code § 71531; purposefully misrepresenting newspaper or periodical circulation, Cal. Bus. & Prof. Code § 17533; selling surplus federal property if the seller's name has a tendency to lead the purchasing public to believe, contrary to the fact, that the seller has an official relationship with the United States Government, or that all articles sold are of higher quality and lower prices than elsewhere obtainable, Cal. Bus. & Prof. Code § 17533.5; and selling merchandise marked "made in U.S.A." when the merchandise or part thereof has been entirely or substantially manufactured elsewhere, Cal. Bus. & Prof. Code § 17533.7 (Supp. 1963).

3

The following adjudications under Cal. Civ. Code § 3369 reflect principles crystallized in the Uniform Act: likelihood of confusion is enough, *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal. App. 2d 23, 27 Cal. Reptr. 833 (1963); accord, *MacSweeney Enterprises v. Tarantino*, 106 Cal. App. 2d 504, 235 P. 2d 266 (1951); actual competition between the parties is not a prerequisite of relief, *Academy of Motion Picture Arts & Sciences v. Benson*, 15 Cal. 2d 685, 104 P. 2d 650 (1940); accord, *Winfield v. Charles*, 77 Cal. App. 2d 64, 175 P. 2d 69 (1946); defendant need not be an intentional wrongdoer, *Visser v. Macres*, 214 Cal. App. 2d 249, 29 Cal. Reptr. 367 (1963); accord, *Hair v. McGuire*, 188 Cal. App. 2d 348, 10 Cal. Reptr. 414 (1961); the statute provides solely for injunctive relief although damages may also be awarded when otherwise permitted by law, see, e.g., *Hesse v. Grossman*, 152 Cal. App. 2d 536, 313 P. 2d 625 (1957); the statute does not contain a restrictive or exclusive definition of unfair competition, *Athens Lodge No. 70 v. Wilson*, 117 Cal. App. 2d 322, 255 P. 2d 482 (1953), what constitutes an unfair or fraudulent business practice under its terms is a question of fact with the essential test being likelihood of public deception, *People v. National Research Co.*, 201 Cal. App. 2d 765, 20 Cal. Reptr. 516 (1962).

The following conduct made actionable by the Uniform Act has been enjoined under Cal. Civ. Code § 3369: likelihood of confusion as to the sponsorship of goods, *MacSweeney Enterprises, Inc. v. Tarantino*, 106 Cal. App. 2d 504, 235 P. 2d 266 (1951); likelihood of confusion of goods caused by misleading trademarks, *Don Alvarado Co. v. Porganan*, 203 Cal. App. 2d 377, 21 Cal. Reptr. 495 (1962), product simulation, *Hesse v. Grossman*, 152 Cal. App. 2d 536, 313 P. 2d 625 (1957), deceptive packaging, *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F. 2d 551 (9th Cir. 1960); or misleading advertising, *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal. App. 2d 23, 27 Cal. Reptr. 833 (1963); likelihood of confusion of businesses, *Visser v. Macres*, 214 Cal. App. 2d 249, 27 Cal. Reptr. 367 (1963); accord, *Karsh v. Haiden*, 120 Cal. App. 2d 75, 260 P. 2d 633 (1953); and false or deceptive advertising injurious to the plaintiff, *Wood v. Peffer*, 55 Cal. App. 2d 116, 130 P. 2d 220 (1942); accord, *Ojala v. Bohlin*, 178 Cal. App. 2d 292, 2 Cal. Reptr. 919 (1960).  But see *Show Management v. Hearst Pub. Co.*, 196 Cal. App. 2d 606, 16 Cal. Reptr. 731 (1961) (refusing damages). The broad dictum of the Show Management case is criticized in Note, 9 U.C.L.A. L. Rev. 719, 723-31 (1962).

**What State Laws Should Be Repealed**

Appended as a comment to section 8 is a state by state analysis of existing state legislation which should be repealed if the Uniform Act is adopted.  It is evident that the list is a short one because the Uniform Act fills a void in most state

legislative schemes by providing a substantive private action for misleading trade identification and false or deceptive advertising.

It might be useful to compare the Uniform Act with existing state legislation of various common types to indicate the types which will not be significantly affected by passage of the Uniform Act; namely, fair trade acts, unfair practice acts, price discrimination acts, weights, measures, and labeling acts, food, drug and cosmetic acts, insecticides, fungicide and rodenticide acts, trademark registration statutes and false advertising acts.

Many states have "fair trade acts" which authorize sellers of trademarked merchandise to make contracts fixing the price at which wholesalers and retailers can resell the merchandise. Selling below the prices set by a fair trade contract is usually declared to be unfair competition actionable at the suit of the seller or distributor who required execution of the contacts. E.g., *General Electric Co. v. Telco Supply Co.*, 84 Ariz. 132, 325 P. 2d 394 (1958); see generally Oppenheim, Unfair Trade Practices 405-06 (2d ed. 1965). The Uniform Act deals with misleading identification of businesses and goods and false and deceptive advertising. It has nothing whatsoever to do with the legality of resale price maintenance. Consequently, "fair trade" legislation does not remove a need for the Uniform Act and enactment of the Uniform Act will not require repeal of existing "fair trade" acts.

Many states have "unfair practices acts" or "unfair sales acts" which prohibit certain sales below cost. Violation of these statutes is often made both a crime and actionalbe at the suit of a competitor. E.g., *Moore v. Northern Kentucky Independent Food Dealers Assn.*, 149 S.W. 2d 755 (1941); see generally Oppenheim, Unfair Trade Practices 444-45 (2d ed. 1965). The Uniform Act deals with misleading identification of business and goods and false and deceptive advertising. It has nothing whatsoever to do with the legality of sales below cost. Consequently, "unfair practices acts" and "unfair sales acts" do not remove a need for the Uniform Act and enactment of the Uniform Act will not require repeal of "unfair practices acts" and "unfair sales acts" dealing with sales below cost.

Many states have "unfair discrimination acts" or "anti-price discrimination acts" which typically prohibit sellers from selling the same goods at different prices in different areas of the state in order to injure competition or to promote a monopoly. Violation of these statutes is often made both a crime and actionable at the suit of a competitor. E.g., *Central Lumber Co. v. State*, 226 U.S. 157 (1912) (South Dakota statute). The Uniform Act deals with misleading identification of businesses and goods and false and deceptive advertising. It has nothing whatsoever to do with the legality of price discrimination. Consequently, "unfair discrimination acts" and "anti-price discrimination acts" do not remove a need for

5

the Uniform Act and enactment of the Uniform Act will not require repeal of "unfair discrimination acts" or "anti-discrimination acts."

Most states have "weights, measures, and labeling acts"; "food, drug, and cosmetic acts"; and "insecticide, fungicide, and rodenticide acts" which are enforced by a state administrative agency. These statutes perform similar functions. "Weights, measures, and labeling acts" set general standards for the packaging and labeling of packaged articles whereas "food, drug, and cosmetic acts," and "insecticide, fungicide, and rodenticide acts" generally require higher standards for the packaging and labeling of the limited types of products within their purview. These statutes may also set standards for advertising. E.g., Del. Code. Ann. tit. 6, § 5125 (Supp. 1964) (Delaware weights and measures statutes prohibit price misrepresentation); N.M. Stat. Ann. 54-1-3, (e) (1963) (ban on false or misleading advertising of "herbicides"). The Uniform Act's ban on misleading identification of businesses and goods and false and deceptive advertising may overlap the false advertising jurisdiction of state agencies charged with administration of "weights, measures, and labeling acts"; "food, drug and cosmetic acts," "insecticide, fungicide, and rodenticide acts," as well as other state statutes which confer limited false advertising jurisdiction on a state administrative agency. E.g., Ala. Code. tit. 28 §§ 90(1) – 90(14) (1958) (insurance commissioner given jurisdiction over methods of competition and unfair or deceptive acts or practices in the insurance business). However, any overlap that exists will not require amendment of the Uniform Act or repeal of the state statutes conferring limited false advertising jurisdiction on an administrative agency. Subsection 3(c) of the Uniform Act declares that "the relief provided in this section is in addition to remedies otherwise available against the same conduct under . . . other statutes of this state." This provision makes clear that the private remedy afforded by the Uniform Act supplements and does not supplant existing state administrative regulation of false advertising. Furthermore, subsection 4(a)(1) provides that "this Act does not apply . . . conduct in compliance with the orders or rules of, or a statute administered by, . . . a state, or local governmental agency." Subsection 4(a)(1) precludes conflict between state administration regulation of false advertising and the Uniform Act by removing from the ambit of the Uniform Act advertising required or approved by a state administrative agency.

Most states have trademark registration statutes which supplement commonlaw protection of trade symbols through provisions for additional private remedies and procedural advantages. E.g., N.Y. Gen. Bus. Law. art. 24; see Note, "Statutory Treatment of the Model State Trademark Bill," 27 Geo. Wash. L. Rev. 353, 354-56 (1959). The Uniform Act, like state trademark registration statutes, supplements common-law protection against use of misleading identification of business and goods. See subsection 2(a)(1), 2(a)(2), and 2(a)(3). Unlike a typical trademark registration statute, however, the Uniform Act modifies the substantive

law applicable to use of misleading trade identification by embracing a likelihood of confusion of sponsorship test for infringement, subsections 2(a)(2) and 2(a)(3), and by explicitly dispensing with proof of actual competition between the parties, section 2(b), and intent to deceive, section 3(a), as fixed prerequisites for injunctive relief.  Inasmuch as trademark registration statutes principally afford procedural and remedial advantages with respect to protection of trade identification, whereas the Uniform Act principally provides substantive advantages with respect to protection of trade identification, state trademark registration statutes do not remove a need for the Uniform Act and enactment of the Uniform Act will not require repeal of state trademark registration statutes.

Most states have a general statute forbidding false advertising as well as a number of specific statutes forbidding false advertising of particular products.  E.g., Tenn. Code. Ann. § 39-1910 (Supp. 1965) (general false advertising statute); Kan. Gen. Stat. Ann. §§ 8-902, 8-903, 8-908 (false advertising anti-freeze).  The older legislation is characterized by criminal sanctions and has seldom been enforced.  See Note, "The Regulation of Advertising," 56 Colum. L. Rev. 1019, 1058-65 (1956).  More recently some state attorneys general, e.g., N.J. Stat. Ann. §§ 56-8-1 to 56-8-12 (Supp. 1963); N.Y. Gen. Bus. Law Art. 22-A, and a few state administrative agencies, e.g., Wis. Stat. Ann. § 100.20 (1957) &  (Supp. 1963) have been given broader powers with respect to false advertising including the ability to obtain an injunction and, though less frequently, the ability to recover a civil penalty.  Even the new type of state false advertising statutes do not, however, remove the need for the Uniform Act.  The effectiveness of any public remedy for false advertising is necessarily limited by budget and personnel problems.  Moreover, false advertising proceedings by state agencies are generally confined to false advertising which significantly affects the public or is outrageously flagrant.  Thus, there remains ample justification for a correlative private action by a person likely to suffer pecuniary loss because of garden-variety false or deceptive advertising without widespread public impact.  See Wetson, "Deceptive Advertising and the Federal Trade Commission," 24 Fed. B.J. 548, 575 (1964) (recommending enactment of both state public remedies against false advertising and the Uniform Deceptive Trade Practices Act ); Restatement (Second), Torts § 712 (tent. Draft No. 8, 1963) (recognition of a broad private remedy for false advertising).  By the same token, enactment of the Uniform Act will not require repeal of existing public remedies against false advertising.  Public remedies are necessary to protect the citizenry from false representations where no private suitor is likely to vindicate the public interest.  E.g., *People v. National Research Co.*, 201 Cal. App. 2d 765, 20 Cal. Reptr. 516 (Third Dist. 1962).  (California attorney general enjoins sale of bogus official letterheads for use in tracing delinquent debtors.)

As indicated, most of the existing state acts need not be repealed because of the language in section 3(c) of the Uniform Act that "the relief provided . . . is in addition to the remedies otherwise available against the same conduct under . . . other statutes of this state."

# UNIFORM DECEPTIVE TRADE PRACTICES ACT

**SECTION 1.  [*Definitions*.]**  As used in this Act, unless the context otherwise requires:

(1) "article" means a product as distinguished from its trademark, label, or distinctive dress in packaging;

## Comment

This is substantially the definition utilized by the Supreme Court in *Sears, Roebuck & Co. v. Stiffel Co.*, 32 U.S.L. Week 4206 (1964) in defining the scope of state ability to enjoin the copying of articles.  See subsection 2(a) for use of the defined term.

(2) "certification mark" means a mark used in connection with the goods or services of a person other than the certifier to indicate geographic origin, material, mode of manufacture, quality, accuracy, or other characteristics of the goods or services or to indicate that the work or labor on the goods or services was performed by members of a union or other organization;

## Comment

A certification mark indicates that goods or services meet the standards or specifications of the certifier.  See Restatement (Second), Torts § 715B, comment (Tent. Draft No. 8, 1963).  Examples are the Good Housekeeping Seal of Approval and the seal of Underwriters' Laboratories.  The definition is substantially the equivalent of the definition of "certification mark" in the Lanham Trademark Act, § 45, 60 Stat. 443 (1946), 15 U.S.C. § 1127 (1958).  See subsection 4(b) for use of the defined term.

(3) "collective mark" means a mark used by members of a cooperative, association, or other collective group or organization to identify goods or services and distinguish them from those of others, or to indicate membership in the collective group or organization;

## Comment

"Collective mark" refers both to a trade or service mark used by members of an organized group to identify goods or services with the organization rather than with individual vendors and to emblems used simply to indicate membership in an organized group. See Restatement (Second), Torts § 715A, comment (Tent. Draft No. 8, 1963). Examples are the "Quality Court" mark used by a group of independent motels, e.g., *Lyon v. Quality Courts United*, 249 F.2d 790 (6th Cir. 1957), and American Automobile Association decalcomania. The definition is substantially the same as the definition of "collective mark" in the Lanham Trademark Act. § 45, 60 Stat. 443 (1946), 15 U.S.C. § 1127 (1958). See subsection 4(b) for use of the defined term.

(4) "mark" means a word, name, symbol, device, or any combination of the foregoing in any form or arrangement;

(5) "person" means an individual, corporation, government, or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, two or more of any of the foregoing having a joint or common interest, or any other legal or commercial entity;

## Comment

This definition is substantially the same as the definition of "person" in Uniform Commercial Code § 1-201(28) and (30) (1962 official text with comments).

(6) "service mark" means a mark used by a person to identify services and to distinguish them from the services of others;

(7) "trademark" means a mark used by a person to identify goods and to distinguish them from the goods of others;

## Comment

The definitions of trademark and service mark parallel those of the Lanham Trademark Act and several state statutes. § 45, 60 Stat. 443 (1946), 15 U.S.C. § 1127 (1958), as amended, 15 U.S.C. § 1127 (Supp. IV, 1963); e.g., Ill. Ann. Stat. ch. 140, § 8(a) (Supp. 1963); N.Y. Gen. Bus. Law § 360(a) & (a-i) (Supp. 1963). See subsection 4(b) for use of the defined terms.

10

(8) "trade name" means a word, name, symbol, device, or any combination of the foregoing in any form or arrangement used by a person to identify his business, vocation, or occupation and distinguish it from the business, vocation, or occupation of others.

### Comment

The definition is substantially the same as the definition of trade name in the Lanham Trademark Act and several state statutes. § 45, 60 Stat. 443 (1946), 15 U.S.C. § 1127 (1958); e.g., Ill. Ann. Stat. ch. 140 § 8(f) (Supp. 1963); N.Y. Gen. Bus. Law § 360 (a-iii) (Supp. 1963). See subsection 4(b) for use of defined terms.

### SECTION 2.  [*Deceptive Trade Practices.*]

(a)  A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(1) passes off goods or services as those of another;

### Comment

Passing off has been said to be "a convenient name for the doctrine that no one should be allowed to sell his goods as those of another." *Vogue Co. v. Thompson-Hudson Co.*, 300 Fed. 509, 512 (6th Cir. 1924). Passing off originally denominated unauthorized use of trade identification but today the term is also applied to covert substitution of a different brand of goods for the one requested by a customer. E.g., *Coca-Cola Co. v. Foods, Inc.*, F. Supp. 101 (D.S.D. 1963).

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

### Comment

The "likelihood of confusion" test is referred to in the Restatement (Second), Torts § 729, comment *a* (Tent. Draft No. 8, 1963) as "a phrase which has long been used in statutes, Federal and State, and in court opinions. . . ." In encompassing probable confusion as to commercial source, approval, endorsement, or certification of goods or services caused by trademarks, service marks, certification marks, or collective marks likely to be associated with preexisting trade symbols, this subsection reflects the trand of authority. E.g., *Triangle Pub., Inc. v. Rohrlich*, 167 F.2d 969 (2d Cir. 1948); *L. E. Waterman Co. v. Gordon*, 72

11

F.2d 272 (2d Cir. 1934); *James Burrough, Ltd. v. Ferrara*, 8 Misc. 2d 819, 169 N.Y.S.2d 93 (Sup.Ct. N.Y. County 1957). See Restatement (Second), Torts § 717 & comments (Tent. Draft No. 8, 1963); Comment, "The Anti-Competitive Aspects of Trade Name Protection and the Policy Against Consumer Deception," 29 U.Chi.L.Rev. 371, 373-75 (1962).

       (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

### Comment

       This subsection concerns likelihood of confusion caused by misleading trade names, e.g., *Viser v. Macres*, 214 Cal. App. 2d 249, 29 Cal. Reptr. 367 (1963) (defendant opened up a competing florist shop with the same name as plaintiff's at plaintiff's former location after the latter had moved across the street).

       (4) uses deceptive representations or designations of geographic origin in connection with goods or services;

### Comment

       This subsection applies to deceptively misdescriptive representations and designations of geographic origin. If geographic terms or symbols are used in a nongeographic sense and are unlikely to be considered descriptive, e.g., "Everest" as a trademark for wrist watches, the subsection is inapplicable. Section 43(a) of the Lanham Trademark Act contains an analogous provision. § 43(a) 60 Stat. 441 (1946), 15 U.S.C. § 1125(a) (1958); *Federal-Mogul-Bower Bearings, Inc. v. Azoff*, 201 F. Supp. 788 (N.D. Ohio 1962), rev'd on other grounds, 313 F.2d 405 (6th Cir. 1963).

       (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

### Comment

       This subsection deals with false advertising of goods, services or businesses. It includes false representations that a person is the representative, successor, associate, or affiliate of another, e.g., *Alaska Sales and Service, Inc. v.*

12

*Rutledge*, 128 F. Supp. 1 (D. Alaska 1955) (false representation of automobile dealership franchise), false representations that goods or services were designed, approved, or sponsored by another, e.g., *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641 (3d Cir. 1958) (false representation of trademark license), and false representations concerning goods of which another is truthfully represented as the commercial source, e.g., false representations by a retailer concerning "Arrow" shirts.  See Restatement (Second), Torts § 712, comment *d* (Tent. Draft No. 8, 1963).  Section 43(a) of the Lanham Act, § 43(a), 60 Stat. 441 (1946), 15 U.S.C. § 1125(a) (1958), and Idaho Code Ann. § 48-412 (Supp. 1963) authorize similar private actions.

 (6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or second-hand;

### Comment

 The conduct referred to in this subsection has been condemned both at common law, e.g., *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 (1947) (alternative holding) (requiring disclosure that spark plugs were repaired); see Restatement (Second), Torts § 714 (Tent. Draft No. 8, 1963), and by a few statutes, e.g., Cal. Bus. & Prof. Code § 17531.

 (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

### Comment

 The conduct referred to in this subsection has been condemned both at common law, e.g., *Burlington Mills Corp. v. Roy Fabrics, Inc.*, 91 F. Supp. 39 (S.D.N.Y.), aff'd per curiam, 182 F.2d 1020 (2d Cir. 1950) (semble) (forbidding sale of second grade materials as first grade); see Restatement (Second), Torts § 714 (Tent. Draft No. 8, 1963); and by a few statutes, e.g., Idaho Code Ann. § 48-412 (Supp. 1963).

 (8) disparages the goods, services, or business of another by false or misleading representation of fact;

## Comment

This subsection reflects the trend of authority allowing businessmen to enjoin disparagement by competitors, e.g., *Maytag Co. v. Meadows Mfg. Co.*, 35 F.2d 403 (7th Cir. 1929), cert. den., 281 U.S. 737 (1930) (bad faith assertions of patent infringement); accord, *Roger v. Stoody Co.*, 192 F.Supp. 949 (W.D. Okla. 1961) (false assertion of product inferiority stated cause of action); *H. E. Allen Mfg. Co. v. Smith*, 224 App. Div. 187, 229 N.Y. Supp. 692 (4th Dep't 1928) (false claims of product inferiority), and noncompetitors, e.g., *Carter v. Knapp Motor Co.*, 243 Ala. 600, 11 So. 2d 383 (1943) (dissatisfied customer enjoined from attempting to coerce auto dealer into giving him another automobile by driving vehicle with white elephant painted on it); accord *Menard v. Houle*, 298 Mass. 546, 11 N.E. 2d 436 (1937) (dissatisfied customer enjoined from continuous, malicious campaign designed to convince public that automobile dealer had sold him a worthless vehicle); *Mayfair Farms, Inc. v. Socony Mobil Oil Co.*, 68 N.J. Super. 188, 172 A.2d 26 (1961) (allegation that Mobile Travel Guide had arbitrarily given plaintiff's establishments unjustified low ratings stated a cause of action for an injunction).

       (9) advertises goods or services with intent not to sell them as advertised;

       (10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

## Comment

Subsections 2(a)(9) and 2(a)(10) deal with "bait advertising," a practice by which a seller seeks to attract customers through advertising at low prices products which he does not intend to sell in more than nominal amounts. When prospective buyers respond to the advertisement, sale of the "bait" is discouraged through various artifices including disparagement and exhaustion of a minuscule stock in order to induce purchase of unadvertised goods on which there is a greater markup. A bait advertising scheme which involved disparagement has been held enjoinable at common law by the manufacturer of the "bait." *Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y. 2d 556, 161 N.E. 2d 197, 190 N.Y.S. 2d 977 (1959). A Connecticut statute similarly authorizes private parties to enjoin bait advertising. Conn. Gen. Stat. Ann. § 42-115(a) (Supp. 1962). Odd lot or clearance sales in which bargains are offered in limited quantities will not run afoul of the proposed statute as long as disclosure is made of the limited stock. Cf. *ibid*.

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or

## Comment

This subsection applies to spurious "fire" and "liquidation" sales as well as to fictitious price cuts. Hawaii Rev. Laws §§ 289-14 and 289-15 (1955) and Mich. Stat. Ann. §§ 28.79(7) and (8) (1962) authorize similar private actions.

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

## Comment

This subsection permits the courts to block out new kinds of deceptive trade practices. The broad language of Cal. Civ. Code § 3369 (Supp. 1963) has been interpreted as creating the analogous general standard of "likelihood of public deception." *People v. National Research Co.*, 201 Cal. App. 2d 765, 20 Cal. Reptr. 516 (1962).

(b) In order to prevail in an action under this Act, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

## Comment

This subsection removes the enumerated factors as absolute bars to relief.

(c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this state.

## Comment

This subsection is intended to ensure that enactment of the Uniform Deceptive Trade Practices Act will not inhibit future development of the law of unfair trading.

### SECTION 3.  [*Remedies*.]

(a)  A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable.  Proof of monetary damage, loss of profits, or intent to deceive is not required.  Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source.

### Comment

Deceptive commercial conduct is made enjoyable at the suit of any person including a nonprofit organization, e.g., *Mayo Clinic v. Mayo's Drug & Cosmetic, Inc.*, 262 Minn. 101, 113, N.W. 2d 852 (1962) (Mayo Clinic held entitled to enjoin use of similar name by a drug wholesale and packaging operation), provided that there is a reasonable probability that the complainant will otherwise incur actual damage.  It is immaterial that the amount of this damage is not provable with certainty or that loss of profits cannot be shown.  Similar phraseology determines standing to sue under Section 43(a) of the Lanham Trademark Act, 60 Stat. 441 (1946), 15 U.S.C. § 1125(a) (1958), and some state statutes, e.g., Conn. Gen. Stat. Ann. § 42-115(a) (Supp. 1962) ("any aggrieved party").  A few state statutes treat false or deceptive advertising as a public wrong enjoinable by any private parties who care to bring suit, e.g., Cal. Civ. Code § 3369(5) (Supp. 1963), Hawaii Rev. Laws, § 289-15 (1955).

Among the principles governing the scope of injunctions against misleading trade identification are the privilege of every tradesman to use commercially necessary language in a nondeceptive fashion, *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 557 (2d Cir. 1963), and state disability to enjoin the copying of articles because of the preemptive operation of the Federal patent and copyright laws.  *Sears, Roebuck & Co. v. Stiffel Co.*, 32 U.S.L. Week 4206 (1964); *Compco Corp. v. Day Brite Lighting, Inc.*, 32 U.S.L. Week 4208 (1964).

(b)  Costs shall be allowed to the prevailing party unless the court otherwise directs.  The court [in its discretion] may award attorneys' fees to the prevailing party if (1) the party complaining of a deceptive trade practice has brought an action which he knew to be groundless or (2) the party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive.

### Comment

Although there is no comparable statutory authorization, federal courts have awarded attorney's fees as an element of cost when deceptive trade practices were

fraudulent or malicious.  *See*, *A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc.*, 204 Fed. Supp. 374 (District Delaware, 1962).  This section gives discretion to state judges to do likewise in appropriate cases whether the prevailing party is the defendant or the plaintiff.  The section directs the court to award attorney's fees to the prevailing party unless the court expressly otherwise directs.

(c)  The relief provided in this section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this state.

### Comment

This subsection preserves a complainant's right to seek damages under the common law or other statutes as well as any available criminal remedies.

### SECTION 4.  [*Application*.]

(a)  This Act does not apply to:

(1) conduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency;

(2) publishers, broadcasters, printers, or other persons engaged in the dissemination of information or reproduction of printed or pictorial matters who publish, broadcast, or reproduce material without knowledge of its deceptive character; or

(3) actions or appeals pending on the effective date of this Act.

(b)  Subsections 2(a)(2) and 2(a)(3) do not apply to the use of a service mark, trademark, certification mark, collective mark, trade name, or other trade identification that was used and not abandoned before the effective date of this Act, if the use was in good faith and is otherwise lawful except for this Act.

### SECTION 5.  [*Uniformity of Interpretation*.]  This Act shall be construed to effectuate its general purpose to make uniform the law of those states which enact it.

SECTION 6.  [*Short Title*.]  This Act may be cited as the Uniform Deceptive Trade Practices Act.


SECTION 7.  [*Severability*.]  If any provision of this Act or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.


SECTION 8.  [*Repeals*.]  The following acts or parts of acts are repealed:

(1)

(2)

(3)

## Comment

State statutes that could be repealed in conjunction with enactment of the Uniform Deceptive Trade Practices Act are:

**Alabama** – None
**Alaska** – None
**Arizona** – None
**Arkansas** – None
**California** – Cal. Civil Code § 3369 provides a broad private substantive remedy for "unfair competition" the scope of which is not definitively defined.  It is recommended that the Uniform Deceptive Trade Practices Act, which specifically highlights major aspects of actionable unfair competition, be appended to section 3369 as a clarifying amendment.
**Colorado** – None
**Connecticut** – The Act should be amended in Section 3(b) to conform to the 1966 amendment of the Uniform Act.
**Delaware** – The Act should be amended in Section 3(b) to conform to the 1966 amendment of the Uniform Act.
**District of Columbia** – None
**Florida** – None
**Georgia** – Ga. Code Ann. § 106-5 (1963) authorizes a private injunctive remedy for some, but not all, of the conduct condemned by the Uniform Act.  It is therefore recommended that present chapter 16-5 be repealed and that the Uniform Act be

enacted in its stead.  If this course of action is adopted, present sections 106-501 and 106-503 should be re-enacted in those sections of chapter 106-99 which currently incorporate them by reference.

**Hawaii** – Hawaii Rev. Laws 289-15 (Supp. 1963) authorizes a substantive private action for some, but not all, of the conduct condemned by the Uniform Act.  Because section 289-15 differs from the Uniform Act in authorizing a damage recovery as well as injunctive relief it is recommended that the Uniform Act be enacted without repeal of section 289-15.

**Idaho** – The Act should be amended in Section 3(b) to conform to the 1966 amendment of the Uniform Act.

**Illinois** – The Act should be amended in Section 3(b) to conform to the 1966 amendment of the Uniform Act.

**Indiana** – None

**Iowa** – None

**Kansas** – None

**Kentucky** – None

**Louisiana** – None

**Maine** – None

**Maryland** – None

**Massachusetts** – Mass. Gen. Laws Ann. ch. 266, §§ 91, 91B (1964) authorize a private substantive remedy for some, but not all, of the conduct condemned by the Uniform Act.  Because section 91 differs from the Uniform Act in requiring intentional or reckless conduct on the part of the defendant for injunctive relief, it is recommended that the Uniform Act be enacted without amendment of section 91.  On the other hand, the private remedy afforded by section 91B duplicates subsections 2(a)(9) and 2(a)(10) of the Uniform Act and it is accordingly recommended that "or any aggrieved party" be deleted from § 91B in conjunction with the enactment of the Uniform Act.

**Michigan** – Mich. Comp. Laws §§ 28.79(10) (as amended Supp. 1963) authorize a substantive private remedy for some, but not all, of the conduct condemned by subsections 2(a)(5) and 2(a)(11) of the Uniform Act.  However, in view of the additional remedies provided for by §§ 28.79(10), notably rescission by a purchaser and a court order to pay sales tax, it is recommended that the Uniform Act be enacted without repeal.

**Minnesota** – Minn. Stat. Ann. §§ 325.141-325.148 (1964) authorize a substantive private remedy for some, but not all, of the conduct condemned by subsections 2(a)(5); 2(a)(7); and 2(a)(11) of the Uniform Act.  However, in view of the fact that § 325.147 authorizes recovery of damages whereas the Uniform Act does not provide for a damage remedy, it is recommended that the Uniform Act be enacted without repeal.

**Mississippi** – None

**Missouri** – None

**Montana** – None

19

**Nebraska** – None
**Nevada** – None
**New Hampshire** – None
**New Jersey** – None
**New Mexico** – N.M. Stat. Ann. §§ 49-12-1 to 49-12-7 (Supp. 1965) authorizes a substantive private action with respect to some, but not all, of the conduct condemned by the Uniform Act. Because the conduct proscribed by §§ 49-12-1 & 2 is not as clearly defined as the conduct proscribed by section 2(a) of the Uniform Act, and because it is desirable that conduct giving rise to a private remedy be as specifically defined as possible it is recommended that section 49-12-5 be amended by striking "or a private citizen" and the last sentence in conjunction with enactment of the Uniform Act.
**New York** – None
**North Carolina** – None
**North Dakota** – N.D. Cent. Code § 51-12-07 (1960) authorizes a substantive remedy for a portion of the conduct condemned by subsection 2(a)(5) of the Uniform Act. In view of the trivial nature of this aspect of § 51-12-07, it is recommended that the last sentence of that section be repealed in conjunction with enactment of the Uniform Act.
**Ohio** – None
**Oklahoma** – The Act should be amended in section 3(b) to conform to the 1966 amendment of the Uniform Act.
**Oregon** – None
**Pennsylvania** – None
**Rhode Island** – None
**South Carolina** – None
**South Dakota** – None
**Tennessee** – Tenn. Code Ann. §§ 69-601 to 69-607 (Supp. 1965) authorizes a private substantive remedy for a fraction of the conduct condemned by subsection 2(a)(5) of the Uniform Act. Nevertheless, because §§ 69-601 to 69-607 provide remedies not contained in the Uniform Act, notably damages and rescision, it is recommended that the Uniform Act be enacted without repeal of §§ 69-601 to 69-607.
**Texas** – None
**Utah** – None
**Vermont** – None
**Virginia** – None
**Washington** – None
**West Virginia** – None
**Wisconsin** – None
**Wyoming** – None

**SECTION 9.  [*Time of Taking Effect*.]**  This Act takes effect
. . . . . . . . . . . . . . . .