No. 23-1751

In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

YORAM KAHN, individually and on behalf of all others similarly situated,
*Plaintiff-Appellant,*

v.

WALMART INC.,
*Defendant-Appellee.*

———————————

On appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:22-cv-04177

———————————

**BRIEF OF RETAIL LITIGATION CENTER, INC., NATIONAL RETAIL FEDERATION, FMI – THE FOOD INDUSTRY ASSOCIATION, AND ILLINOIS RETAIL MERCHANTS ASSOCIATION AS AMICI CURIAE SUPPORTING APPELLEE AND AFFIRMANCE**

———————————

Deborah R. White
RETAIL LITIGATION CENTER, INC.
99 M Street, S.E., Suite 700
Washington, DC 20003
T: (202) 869-0200
deborah.white@rila.org

Matthew A. Fitzgerald
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716
F: (804) 698-2251
mfitzgerald@mcguirewoods.com

*Counsel for Amici Curiae Retail Litigation Center, Inc., National Retail Federation, FMI – The Food Industry Association, and Illinois Retail Merchants Association*

Save As     Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: __23-1751__

Short Caption: __Yoram Kahn v. Walmart Inc.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    __Retail Litigation Center, Inc.; National Retail Federation; FMI – The Food Industry Association;__

    __Illinois Retail Merchants Association__

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    __McGuireWoods LLP__

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

       __None for all amici.__

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       __None for all amici.__

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    __N/A__

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    __N/A__

Attorney's Signature: __/s/ Matthew A. Fitzgerald__     Date: __09/22/2023__

Attorney's Printed Name: __Matthew A. Fitzgerald__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✓]   **No** [ ]

Address: __800 East Canal Street__

    __Richmond, VA 23219__

Phone Number: __(804) 775-4716__     Fax Number: __(804) 698-2251__

E-Mail Address: __mfitzgerald@mcguirewoods.com__

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICI ................................................................................... 1

INTRODUCTION ......................................................................................... 3

ARGUMENT ................................................................................................ 6

I.  Store level price labeling in the real world. ........................................ 6

    A.  The American retail experience and shelf labels. ................................ 6

    B.  Price changes and price discrepancies. ................................................. 8

II.  Retailers safeguard against price discrepancies. ............................... 12

    A.  Point-of-sale displays allow consumers to examine the price as the item is being scanned. ............................................................................ 12

    B.  Receipts allow customers to review prices on the spot. .................... 15

    C.  Policies to honor lower shelf prices help avoid consumer harm. ..... 16

    D.  Courts have recognized that these safeguards demonstrate that a price discrepancy is not deceptive or unfair conduct. ..................... 18

III.  Robust government oversight regulates price discrepancies. ..................... 21

IV.  Authorizing strict liability class actions over price discrepancies would upset the regulatory system and impose an impossible standard.............. 24

    A.  Private lawsuits conflict with government oversight. ........................ 24

    B.  Private lawsuits would have adverse consequences. ......................... 26

CONCLUSION.............................................................................................. 27

CERTIFICATE OF COMPLIANCE ............................................................ 28

CERTIFICATE OF SERVICE ..................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Davis v. G.N. Mortg. Corp.*,
    396 F.3d 869 (7th Cir. 2005) ................................................................. 18

*Gil v. Reed*,
    535 F.3d 551 (7th Cir. 2008) ................................................................. 6

*Grgat v. Giant Eagle, Inc.*,
    135 N.E.3d 846 (Ohio Ct. App. 2019) ................................................... 19

*Kirtsaeng v. John Wiley & Sons, Inc.*,
    568 U.S. 519 (2013) .............................................................................. 1

*Reinbrecht v. Walgreen Co.*,
    742 N.W.2d 243 (Neb. Ct. App. 2007) ................................................. 20

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018) .......................................................................... 1

*Tudor v. Jewel Food Stores, Inc.*,
    681 N.E.2d 6 (Ill. Ct. App. 1997) ................................................... 16, 19

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ............................................................... 18

**Statutes**

1 N.Y. C.R.R. 220.14 ............................................................................. 21

1 N.Y. C.R.R. 220.2(a) ........................................................................... 14

225 ILCS 470/11 .................................................................................... 22

225 ILCS 470/29 .................................................................................... 22

225 ILCS 470/56.1 ................................................................................. 23

225 ILCS 470/58 .................................................................................... 23

302 KAR 80:010(1) ................................................................................ 14

Ill. Admin. Code tit. 8, § 600.330 ................................................................ 14

N.J.A.C. 13:47B-1.20 ..................................................................................... 14

OAC § 901:6-1-01 .......................................................................................... 14

R.C. 1327.50(T)(1) ........................................................................................ 21

**Other Authorities**

Chris Biggs *et al.*, *Amid Uncertainty, AI Gives Retailers a Path to Resilience*, Boston
    Consulting Group (Apr. 25, 2023),
    https://www.bcg.com/publications/2023/improving-resilience-with-the-
    use-of-ai-in-retail ...................................................................................... 8, 9

Board of Governors of the Federal Reserve System, *Monetary Policy Report* (June
    2023), https://www.federalreserve.gov/monetarypolicy/2023-06-mpr-
    summary.htm ............................................................................................ 9, 10

Kristin Broughton, *Retailers Face Pressure to Offer Discounts While Battling Inflation*,
    The Wall Street Journal (Sept. 23, 2022),
    https://www.wsj.com/articles/retailers-face-pressure-to-offer-discounts-
    while-battling-inflation-11663932601 ......................................................... 9

City of Chicago, *Retailers' Rules and Regulations* (2012), available at
    https://www.chicago.gov/dam/city/depts/bacp/rulesandregs/retailerrule
    sregulations312012.pdf ..................................................................... 14, 23, 25

County of Marin, Dept. of Weights & Measures, *2020 Marin County Consumer
    Protection Report*, https://www.marincounty.org/-
    /media/files/departments/ag/consumer-protection-reports/2020-marin-
    county-consumer-protection-report.pdf?la=en ........................................ 24

*Federal Reserve Press Release*, Federal Reserve (July 26, 2023),
    https://www.federalreserve.gov/newsevents/pressreleases/monetary202
    30726a.htm ................................................................................................... 9

Fla. Dept. of Agriculture and Consumer Services, *What should I do if an item purchased at a store scans at a different price than the posted or advertised price?*, https://www.fdacs.gov/Consumer-Resources/Consumer-Rights-and-Responsibilities/Weights-and-Measures/What-should-I-do-if-an-item-purchased-at-a-store-scans-at-a-different-price-than-the-posted-or-advertised-price ...................................................................................................................... 17

The Food Industry Association, *Food Industry Facts*, https://www.fmi.org/our-research/food-industry-facts ................................................................ 7

JCPenny, *Customer Service > pricing*, https://www.jcpenney.com/m/customer-service/pricing ........................................................................................ 17

*John Wanamaker: Fixed Prices & Customer Satisfaction*, Institute in Basic Life Principles, https://iblp.org/john-wanamaker-fixed-prices-and-customer-satisfaction/ ..................................................................................................... 7

Marc Labonte *et al.*, *Inflation in the U.S. Economy: Causes and Policy Options*, Congressional Research Service R47273 (Oct. 6, 2022), https://crsreports.congress.gov/product/pdf/R/R47273/2 ........................... 10

Jinjoo Lee, *Retailers' Wage Competition Is Still Hot*, The Wall Street Journal (Mar. 17, 2023), https://www.wsj.com/articles/retailers-wage-competition-is-still-hot-b6503329 .......................................................................... 11

Jitender Miglani, *Top Five Challenges US Retailers Face Due to Rising Interest Rates*, Forrester (Aug. 17, 2023), https://www.forrester.com/blogs/top-five-challenges-us-retailers-face-due-to-rising-interest-rates/?utm_source=forbes&utm_medium=pr&utm_campaign=b2cm ............. 9

Minutes of the Federal Open Market Committee (Mar. 21-23, 2023), https://www.federalreserve.gov/monetarypolicy/fomcminutes20230322.htm ................................................................................................................... 10

National Retail Federation, *Retail's Impact: Illinois*, https://nrf.com/retails-impact/illinois .......................................................................................... 6

NIST, *Handbook 44*, (2023 ed.), available at https://www.nist.gov/pml/owm/publications/nist-handbooks/handbook-44-current-edition ............................................................................................ 14

NIST, *Handbook 130* (2023 ed.), available at
https://www.nist.gov/system/files/documents/2023/02/05/2023%20NIST%20HB130.pdf ................................................................ 13, 21, 22, 24

NIST, Unit Pricing Guide, available at
https://www.govinfo.gov/content/pkg/GOVPUB-C13-4851a46324cc86af742242cfc5a93d9a/pdf/GOVPUB-C13-4851a46324cc86af742242cfc5a93d9a.pdf ................................................ 8

Ohio Dep't of Agriculture Annual Report, Weights & Measures Inspections 2021,
https://agri.ohio.gov/wps/wcm/connect/gov/ceaa2f00-184c-4cd1-bc84-57f6833e1ca6/2021+ODA+W%2BM_Annual+Report.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F56-ceaa2f00-184c-4cd1-bc84-57f6833e1ca6-oplvnAF ...................... 23

Publix, *Publix Promise*,
https://www.publix.com/pages/policies/publix-promise ............................ 16

Adam Smith, *Walmart's Wrong Price Policy: What You Need to Know to Avoid Being Overcharged | Walmart Wrong Price Policy*, Dear Adam Smith (Dec. 19, 2022), https://dearadamsmith.com/walmart/walmart-wrong-price-policy/ ................................................................................................ 18

State of Wisconsin Dep't of Agriculture, Trade and Consumer Protection, Weights and Measures Inspection Statistics for 2021,
https://datcp.wi.gov/Pages/Publications/WeightsAndMeasuresInspectionStats.aspx ................................................................................ 23

Harris Teeter, *Scan Guarantee*,
https://www.harristeeter.com/i/coupon-policy ................................................ 17

US Bank, *Federal Reserve Focuses Monetary Policy on Fighting Inflation*, U.S. Bank Market News (Aug. 15, 2023),
https://www.usbank.com/investing/financial-perspectives/market-news/federal-reserve-tapering-asset-purchases.html ........................................ 10

Virginia Dep't of Agriculture and Consumer Services, Press Release:  VDACS' Weights and Measures Inspections Protect Virginia's Consumers and Businesses (Mar. 1, 2023), https://www.vdacs.virginia.gov/press-releases-230301-weights-measure.shtml ................................................................ 23

Brian Wallheimer, *Are you Ready for Personalized Pricing?*, Chicago Booth Review
(Feb. 26, 2018), https://www.chicagobooth.edu/review/are-you-ready-
personalized-pricing ................................................................................ 8

Mark Wilson, *This behind-the-scenes app keeps Walmart's shelves stocked all the time*,
Fast Company (June 3, 2021), https://www.fastcompany.com/90642935/this-
behind-the-scenes-app-keeps-walmarts-shelves-stocked-all-the-time .............. 7

## INTEREST OF AMICI[1]

The Retail Litigation Center, Inc. ("RLC") represents national and regional retailers, including many of the country's largest and most innovative retailers, across a breadth of retail verticals.  The RLC's members employ millions of people throughout the United States, provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales.  The RLC offers courts retail-industry perspectives on important legal issues and highlights the industry-wide consequences of significant cases.  Since its founding in 2010, the RLC has filed more than 200 amicus briefs on issues of importance to the retail industry.  *See, e.g.*, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018) (citing the RLC's brief); *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 542 (2013) (citing the RLC's brief).

The National Retail Federation ("NRF") is the world's largest retail trade association.  The NRF's membership includes retailers of all sizes, formats, and channels of distribution in over 45 countries.  In the United States, the NRF represents the breadth and diversity of an industry that is the nation's largest sector employer with more than 52 million employees and contributes $3.9

---

[1] No counsel for any party authored this brief in whole or in part.  No person or entity other than amici curiae or their counsel made a monetary contribution to the brief's preparation or submission.

trillion annually to GDP.  NRF regularly submits amicus curiae briefs in cases raising significant legal issues for the retail community.

FMI – The Food Industry Association ("FMI") works with and on behalf of the entire food industry to advance a safer, healthier and more efficient consumer food supply.  FMI brings together a wide range of members across the value chain—from retailers who sell to consumers, to producers who supply the food, as well as the many companies providing critical services—to amplify the collective work of the industry.  FMI's membership includes nearly 1,000 supermarket member companies that collectively operate almost 33,000 food retail outlets and employ about 6 million workers.  FMI is a champion for the food industry and the issues that make a difference to their members' fundamental mission of feeding and enriching society.

In existence since 1957, the Illinois Retail Merchants Association ("IRMA") is the only statewide association exclusively representing 23,000 retailer stores of all sizes and formats throughout the state of Illinois.  IRMA represents an industry that accounts for more than 20% of employment in Illinois and generates the second most revenue for the state of Illinois and the largest for local governments.

The RLC, NRF, FMI, and IRMA (together, "Amici") have a particular interest in this case because nearly all of their members sell merchandise to

consumers through brick-and-mortar stores, among other channels. The standard of liability for shelf-level pricing discrepancies is thus an important question of law that will impact retailers as well as their customers and employees. Amici file this amicus brief pursuant to Federal Rule of Appellate Procedure 29 and Seventh Circuit Rule 29.

## INTRODUCTION

The real world of retail shelf pricing is much more complex and challenging than Plaintiff and the Illinois Attorney General would have this Court believe.

Today there are probably 5,000,000,000 different items of merchandise on the shelves of retailers in Illinois alone. Prices for those items change frequently, because they must: retail is an extraordinarily competitive industry. That level of competition requires constant attention to pricing in a way that unquestionably benefits consumers.

Depending on the retailer, changing a price generally involves both updating an electronic point-of-sale system and physically changing labels on shelves. Information in an electronic point-of-sale system can be updated with a few keystrokes. But shelf price labels are usually changed by hand. A store employee must remove each old label and replace it with a new one, and do so in a manner that comports with detailed weights-and-measures laws and

regulations.  Given the large number of items, the need to change prices often, and the challenges of the current labor shortage, occasional mistakes are inevitable.

Plaintiff and the Illinois Attorney General seek to hold all retailers to an unrealistic level of perfection under a proposed strict liability standard for price discrepancies under state consumer protection laws.  They argue that a single price discrepancy among the 31,500 different items (on average) that sit on the shelves of a single store should subject the retailer to class action suits because, in their view, any such error constitutes a deceptive practice against an untold number of consumers.

That position is not only unrealistic, but is also unnecessary for deterrence and duplicates existing regulation.  The legal and operational safeguards in place in most states (including Illinois) and at most stores to protect consumers from price discrepancies obviate any need for nationwide class actions in this space.  For example, as often required by law, retailers have installed displays at checkout so that every consumer can follow along and monitor the price of each item as it is scanned and before they pay.  Retailers also give consumers an itemized receipt at checkout that includes the price of each item—this, too, is often required by law.  In addition, many retailers have policies on price discrepancies.  Commonly, if a discrepancy arises between the shelf price and

4

scan price, the cashier gives the consumer whichever price is lower.  Plaintiff and the Illinois Attorney General would have this Court ignore all of this.

Pricing accuracy is also governed by existing regulatory schemes, none of which require perfection.  Most regulatory schemes developed by government experts consider a store compliant if 98% of items are labeled accurately on the shelf (i.e., more than 620 out of the average 31,500 must be inaccurate to trigger a penalty).  And as Plaintiff notes in his complaint, state and local regulators enforce existing laws on pricing accuracy.  In short, checking prices for compliance on retail shelves is an appropriate role for regulators (typically weights and measures officials).  It is not a proper job for consumers like Plaintiff, who apparently conducted his own multi-state investigation, specifically hunting for price discrepancies to gin up this litigation (although this behavior obviously belies any assertion that he was "deceived").  Allowing a few mistaken labels to form the basis of class action litigation turns consumers into vigilante weights and measures officials and imposes a far stricter—virtually impossible—standard of perfection on stores and their employees, to the exclusive benefit of the plaintiffs' bar.

Accordingly, this brief provides additional context to this Court about the practical realities of retail shelf pricing and store operations, as well as the practical consequences of the position Plaintiff urges this court to adopt.  As

judges "need not check [their] common sense at the door." *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008), Amici respectfully ask this Court to consider these practicalities along with Defendant-Appellee's legal arguments in deciding this appeal.

## ARGUMENT

I.  **Store level price labeling in the real world.**

A.  **The American retail experience and shelf labels.**

Retail stores are vital to the American experience.  From large national chain stores to "mom-and-pop" shops, Americans obtain necessities and luxuries alike from physical in-person shopping.  In Illinois alone, there are more than 144,000 retail store locations.[2]  Collectively, those retailers support 25% of the jobs (over two million) in the state and generate $60.7 billion for the state GDP of Illinois.[3]  Walmart alone has more than 180 stores in Illinois.

---

[2] National Retail Federation, *Retail's Impact: Illinois*, (last visited Sept. 21, 2023), https://nrf.com/retails-impact/illinois (click "Download Illinois Report").

[3] *Id.*

Inside each store, brick-and-mortar retailers have on the shelves at any one time an average of about 31,530 items.[4]  Walmart stores, which are larger than average, usually have about 120,000 different items for sale.[5]

Retailers give customers descriptive information about the merchandise on their shelves through a variety of means, including the information printed on the label affixed to the shelf where the item is found.  This label displays pertinent information about the product, including its name and price, unit price and sometimes information on whether it is on sale or part of a promotion.  Given the vast number of items available at retail, there are almost *five billion* shelf labels in Illinois at any given time—over 22 million of which are at Walmart stores.  Ensuring that five billion shelf labels in Illinois are all correct 100% of the time is impossible as a practical matter.

Retailers did not always use shelf labels.  In the early 1800s, there were *no* price labels (with a few exceptions).[6]  Retailers would negotiate prices on a per-

---

[4] The Food Industry Association, *Food Industry Facts*, https://www.fmi.org/our-research/food-industry-facts (last visited Sept. 21, 2023).

[5] Mark Wilson, *This behind-the-scenes app keeps Walmart's shelves stocked all the time*, Fast Company (June 3, 2021), https://www.fastcompany.com/90642935/this-behind-the-scenes-app-keeps-walmarts-shelves-stocked-all-the-time.

[6] *John Wanamaker: Fixed Prices & Customer Satisfaction*, Institute in Basic Life Principles, https://iblp.org/john-wanamaker-fixed-prices-and-customer-satisfaction/ (last visited Sept. 21, 2023).

customer, per-item basis.[7]  As stores shifted to a self-service model that enabled customers to select items independently without going through a store clerk, retailers adopted price tags that were affixed to each item.  Providing a uniform sales price was fair to everyone and helped make the self-service model a reality. But as the world embraced the self-service model, and as stores grew larger and barcode scanning technology developed, item tags gave way to shelf tags for many products.  To facilitate the accuracy of these tags, NIST published a "Unit Pricing Guide" in 2015 that has been widely followed by the retail industry.[8]

## B.    Price changes and price discrepancies.

Prices for individual items sold through retail stores change frequently because of a variety of economic vectors in the highly competitive retail industry. Sometimes prices change due to market competition, a condition that retailers can now detect in virtual real-time.  Fierce competition in retail is a fact of life, and any given store's profit margins can be razor thin.[9]  If prices are too high, the

---

[7] Brian Wallheimer, *Are you Ready for Personalized Pricing?*, Chicago Booth Review (Feb. 26, 2018), https://www.chicagobooth.edu/review/are-you-ready-personalized-pricing.

[8]  Available at: https://www.govinfo.gov/content/pkg/GOVPUB-C13-4851a46324cc86af742242cfc5a93d9a/pdf/GOVPUB-C13-4851a46324cc86af742242cfc5a93d9a.pdf.

[9] Chris Biggs *et al.*, *Amid Uncertainty, AI Gives Retailers a Path to Resilience*, Boston Consulting Group (Apr. 25, 2023), https://www.bcg.com/publications/2023/improving-resilience-with-the-use-

store will lose precious sales to its competitor down the street.  If prices are too low, the retailer may sell at a loss, potentially going into the red with every sale.[10] Retail stores compete not only against other brick-and-mortar stores, but also against online retailers who have lower overhead and can change prices across thousands of products with a few keystrokes.  And as one retailer changes prices, so will others—increasing competition to the benefit of consumers.

But competition among retailers is not the only vector that leads to price changes.  Items may be marked down to meet lower market demand or to move merchandise to make space available for other items, based on season, fashion, or innumerable other consumer-based factors.  Other prices are adjusted to reflect external considerations like supply chain issues or other business costs.  And prices must also always keep pace with inflation, which has fluctuated dramatically in recent years.[11]

---

of-ai-in-retail; Kristin Broughton, *Retailers Face Pressure to Offer Discounts While Battling Inflation*, The Wall Street Journal (Sept. 23, 2022), https://www.wsj.com/articles/retailers-face-pressure-to-offer-discounts-while-battling-inflation-11663932601.

[10] Jitender Miglani, *Top Five Challenges US Retailers Face Due to Rising Interest Rates*, Forrester (Aug. 17, 2023), https://www.forrester.com/blogs/top-five-challenges-us-retailers-face-due-to-rising-interest-rates/?utm_source=forbes&utm_medium=pr&utm_campaign=b2cm.

[11] *Federal Reserve Press Release*, Federal Reserve (July 26, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230726a.htm; Board of Governors of the Federal Reserve System, *Monetary Policy Report*

For retailers that use electronic point-of-sale systems and printed shelf labels, changing the price for a product generally has two components.  One component is electronically updating the point-of-sale system, which can be done with a few keystrokes.  Once accomplished, the new price automatically rings up at the point-of-sale systems (i.e., cash registers) at the front of the store.  The second component concerns the label on the shelf that appears next to each product.  This update must be done manually.  To update the shelf label, an employee at each location must first print out new shelf labels.  Then the employee must locate each product that needs an updated price, remove the old shelf label, and replace it with the updated shelf label.  This manual process sometimes involves dozens of employees in multiple different stores.

To minimize the likelihood of a discrepancy between the point-of-sale price and the price that appears on a shelf label, retailers that use both an electronic system and shelf labels try to make both changes as close in time as

(June 2023), https://www.federalreserve.gov/monetarypolicy/2023-06-mpr-summary.htm; *see also* Marc Labonte *et al.*, *Inflation in the U.S. Economy: Causes and Policy Options*, Congressional Research Service R47273 (Oct. 6, 2022), https://crsreports.congress.gov/product/pdf/R/R47273/2; Minutes of the Federal Open Market Committee (Mar. 21-23, 2023), https://www.federalreserve.gov/monetarypolicy/fomcminutes20230322.htm; *see also* US Bank, *Federal Reserve Focuses Monetary Policy on Fighting Inflation*, U.S. Bank Market News (Aug. 15, 2023), https://www.usbank.com/investing/financial-perspectives/market-news/federal-reserve-tapering-asset-purchases.html.

possible.  For example, a retailer that does not operate 24-7 may pick a time when the store is closed to update the electronic price and to ask its store level employees to print and change shelf labels at the same time.  Dozens or hundreds of price changes may occur during these periods.  Retailers who serve customers around the clock and never close, though, must necessarily execute price changes while customers are in the store.  Store clerks who are in the process of changing prices may well be interrupted by a customer whose interests will always come first.

 Even with the best of intentions and systems, mistakes—almost always simple human error—inevitably happen.  When there are tens of thousands of products sold in a store and perhaps hundreds that need prices updated at any one time, a particular shelf label may easily be misplaced or overlooked.  Tight labor markets that often leave retailers with employee shortages make this even more difficult.[12]

Pricing discrepancies, of course, happen in both directions.  Sometimes, a customer may be charged a lower price at the register than the price that appeared on the shelf tag.  Regardless, retailers and their store employees work

---

[12] Jinjoo Lee, *Retailers' Wage Competition Is Still Hot*, The Wall Street Journal (Mar. 17, 2023), https://www.wsj.com/articles/retailers-wage-competition-is-still-hot-b6503329.

hard to ensure that the price on the shelf tag for every single product matches the price that the customer will be charged when she checks out her basket.

## II.     Retailers safeguard against price discrepancies.

Nonetheless, human error is a fact of life.  Shelf tag prices in a retail store are largely a people-enabled process, and mistakes happen.  To help mitigate the impact on customers, retailers employ multiple safeguards.

### A.     Point-of-sale displays allow consumers to examine the price as the item is being scanned.

Most retailers have a point-of-sale system that displays the prices when the store clerk scans or rings up the item.  Once upon a time, cash registers had a display that popped up the price for every item rung up by the store clerk.



Today's displays often show each product's name and the price charged:



For items that have a price per unit weight, like grapes that are sold by the pound, the display may show that as well. Some retail systems will also state the price charged out loud so that the customer can hear the information in addition to seeing it.

As the National Institute of Standards and Technology ("NIST") of the U.S. Department of Commerce explains, "[t]he importance of consumer access to [a point-of-sale] display of product information and price *cannot be overstated*." NIST, *Handbook 130*,[13] Examination Procedure for Price Verification § 6.1 (2023 ed.) (emphasis added). The point-of-sale display allows customers to "verify

---

[13] The current version of NIST Handbook 130 can be found at https://www.nist.gov/system/files/documents/2023/02/05/2023%20NIST%20HB130.pdf.

prices as the items are being scanned," which alerts customers to any price problem *before* "the transaction is completed." *Id.* To that end, most retailers adopt NIST's guidance that a point-of-sale display "equipped with a primary indicating element . . . be positioned so that its indications may be accurately read and the weighing or measuring operation may be observed from some reasonable customer and operator position." NIST, *Handbook 44*, User Requirements § G-UR 3.3 (2023 ed.).[14]

Many states (including Illinois) require point-of-sale displays, often through the adoption of NIST's model regulations. *See, e.g.*, Ill. Admin. Code tit. 8, § 600.330 (adopting NIST *Handbook 44*); 302 KAR 80:010(1) (Kentucky); OAC § 901:6-1-01 (Ohio); N.J.A.C. 13:47B-1.20 (New Jersey); 1 N.Y. C.R.R. 220.2(a) (New York). Localities can also require point-of-sale displays. *See, e.g.*, City of Chicago, *Retailers' Rules and Regulations*, Section 2, Rule 12 (2012) ("*Retailer's Rules*")[15] (requiring a point-of-sale display that "provide[s] visible indication, which can be observed from a reasonable customer position, of an item's [p]rice

---

[14] The current version of NIST Handbook 44 can be found at https://www.nist.gov/pml/owm/publications/nist-handbooks/handbook-44-current-edition.

[15] Available at: https://www.chicago.gov/dam/city/depts/bacp/rulesandregs/retailerrulesregulations312012.pdf (last visited Sept. 21, 2023).

and description").  In doing so, these states and localities recognize that point-of-sale displays convey important pricing information to customers.  Indeed, the display could be considered a final offer of the price of the item before the consumer accepts the price by paying.  It also helps to cure any incorrect information the consumer might have received from an inaccurate shelf label.[16]

### B.      Receipts allow customers to review prices on the spot.

An itemized receipt is provided or offered alongside essentially every American retail purchase.  The receipt acts much like the point-of-sale display by providing the customer with information about the products purchased and the price paid.  The receipt is provided at the conclusion of the transaction and memorializes that transaction in writing.  The receipt therefore allows the customer to review the transaction details right away before leaving the store, as well as to keep the information for future reference or returns.

Many states, counties, and cities require receipts.  In 2011, the City of Chicago Department of Business Affairs and Consumer Protection issued Retailer's Rules and Regulations requiring retailers to issue receipts.  *See Retailer's*

---

[16] It is safe to assume that Walmart has the required point-of-sale displays in the Illinois stores at which Plaintiff shopped.  Not only are they required by law, but given the frequency with which Plaintiff shopped at Walmart stores and the fact that his complaint does not allege their absence, it is reasonable to conclude that Plaintiff did in fact encounter the appropriate systems when he was making the transactions at issue.  Whether he willfully ignored them is another story.

*Rules*, Section 2, Rule 13 ("Except as otherwise provided in these rules, every purchase must be documented by a receipt.  A copy of the receipt must be offered to the customer.").

Not only are receipts often required by law and a good customer-service practice, courts have considered retailers' receipts as evidence that the retailer did not intend to deceive the consumer if there was a discrepancy between the shelf label and the price charged at the register.  Indeed, *Tudor v. Jewel Food Stores, Inc.*, 681 N.E.2d 6, 8 (Ill. Ct. App. 1997), addressed price discrepancy claims just like those alleged here and rejected any theory of consumer deception because, among other things, the retailer provided a receipt that "enabl[ed] [the plaintiff] to determine whether the scanned prices accurately reflected the advertised and shelf prices."  *Id.*  As a result, the discrepancy between shelf price and scan price was not deemed to be deceptive or unfair.  *Id.*

### C.    Policies to honor lower shelf prices help avoid consumer harm.

In addition to point-of-sale safeguards, many retailers have policies to reimburse customers if the price listed on the store shelf differs from the price charged at the point-of-sale.[17]  These policies generally state that the retailer will

---

[17] *See, e.g.*, Publix, *Publix Promise*, https://www.publix.com/pages/policies/publix-promise (last visited Sept. 21, 2023) ("Our Publix Promise guarantees that if during checkout, the scanned price of an item (excluding alcohol and tobacco products) exceeds the shelf price or advertised price, we will give the customer one of that item free. We will charge

honor the lower shelf label price.[18]  The retailer can honor that price either during

the transaction through a price override, or it can refund the difference after the

transaction ends.  Not only do these policies demonstrate a commitment to

customer service, they help ensure that store personnel are notified of any price

discrepancies so they can correct them.

   These policies are widely known and publicized by news outlets in

addition to being posted in stores.  For example, multiple news articles have

reported that Walmart and other retailers have policies to address price

discrepancies and provide information on how consumers can bring the

------

the lower price for the remaining items."); JCPenny, *Customer Service > pricing*,
https://www.jcpenney.com/m/customer-service/pricing (last visited Sept. 21,
2023) ("We work hard to ensure the accuracy of pricing on JCPenney.com, but
despite our best efforts, pricing errors occur. If the price you are charged for any
item is higher than the price posted or advertised, we will promptly refund the
difference."); Harris Teeter, *Scan Guarantee*,
https://www.harristeeter.com/i/coupon-policy (last visited Sept. 21, 2023)
("Our scan guarantee states 'If an item scans higher than the shelf tag or sign,
you will receive one 1 item free and any additional quantities at the price stated,
excluding alcohol and tobacco.'").

[18] *See, e.g.*, Fla. Dept. of Agriculture and Consumer Services, *What should I do if an
item purchased at a store scans at a different price than the posted or advertised price?*,
https://www.fdacs.gov/Consumer-Resources/Consumer-Rights-and-
Responsibilities/Weights-and-Measures/What-should-I-do-if-an-item-
purchased-at-a-store-scans-at-a-different-price-than-the-posted-or-advertised-
price (last visited on Sept. 21, 2023) ("Many businesses have policies in place to
immediately correct any discrepancies and reward customers that bring pricing
errors to their attention.").

information to the attention of the store.[19]  All discrepancies can be handled right at the register in the store.  Anyone who is as interested in pricing as the Plaintiff clearly is should be well aware of the easy ways available to fix any mistakes.

### D.  Courts have recognized that these safeguards demonstrate that a price discrepancy is not deceptive or unfair conduct.

The Illinois Consumer Fraud Act, like other consumer protection statutes, "protects consumers against unfair or deceptive acts or practices."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 574 (7th Cir. 2012).  Whether conduct is deceptive or unfair requires considering the context of the allegedly wrongful conduct.  *See Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005) ("Moreover, when analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff.").

In the pricing accuracy context, safeguards, such as point-of-sale displays, receipts, and store pricing accuracy policies, all help protect customers from price errors.  Retailers use these safeguards to protect consumers from inevitable mistakes and to increase pricing accuracy.  Courts correctly recognize that the use of these safeguards dispels any alleged deception or unfairness.

---

[19] Adam Smith, *Walmart's Wrong Price Policy: What You Need to Know to Avoid Being Overcharged | Walmart Wrong Price Policy*, Dear Adam Smith (Dec. 19, 2022), https://dearadamsmith.com/walmart/walmart-wrong-price-policy/. Walmart also allows returns, for full refund, with a receipt for any reason. Available at:  https://www.walmart.com/cp/returns/1231920.

In *Tudor*, the plaintiff brought a consumer deception claim based on an alleged discrepancy between the price listed on the store shelf tag and the price charged at the point of sale. But the retailer's electronic scanners provided a receipt that "enabl[ed] [the plaintiff] to determine whether the scanned prices accurately reflected the advertised and shelf prices." 681 N.E.2d at 8. Cementing the court's conclusion that the price discrepancy did not constitute deceptive or unfair conduct was the retailer's "money-back guarantee if the scanned price differ[ed] from the shelf price." *Id*.

Similarly, in *Grgat v. Giant Eagle, Inc.*, 135 N.E.3d 846, 848, 852 (Ohio Ct. App. 2019), a plaintiff brought a consumer deception claim because the shelf label failed to disclose that the price advantage from a multiple-unit purchase carried over to purchases of less than the advertised quantities. But the court found that the plaintiff failed to state a claim for deceptive conduct because "the customer is explicitly informed in writing of the unit price . . . on the computer screen facing the customer when the product is scanned at the checkout before the customer pays for the item." *Id.* at 852. That same price disclosure "is also set out in writing in the customer's receipt." *Id*. In other words, any possible price-related deception at the shelf was cleared up by the accurate price-related disclosures at check out. *Id*.

19

Further, in *Reinbrecht v. Walgreen Co.*, 742 N.W.2d 243, 245 (Neb. Ct. App. 2007), a plaintiff brought a consumer deception claim because, when he asked a store clerk for a pack of stamps, the clerk scanned the stamps without giving the plaintiff an opportunity to look the stamps over (including seeing their price). This conduct was held not deceptive because "[t]he price was shown on[, among other things,] the cash register display, and the receipt given to the customer." *Id.* at 249. Because the retailer "provided information about the price before and at the time of sale," the "method and manner of selling [stamps] was neither unfair nor deceptive." *Id.*

These cases all reflect the importance of the common safeguards. While Plaintiff and the Illinois Attorney General acknowledge the need to consider the totality of information, they fail to do so because, if they did, they would lose. The Illinois Consumer Fraud Act punishes intentionally bad behavior; it is not supposed to be a trap for the unwary. To avoid this reality, the Plaintiff and the Illinois AG wrongly minimize the role of receipts, ignore the value of point-of-sale displays, and avoid the fact that most retailers (including Walmart) have policies to correct pricing discrepancies. These safeguards alter the analysis by building on the retailer's commitment to ensure pricing accuracy as close to 100% as possible, by giving customers tools to spot and correct any mistakes immediately before and right after paying for an item. And if there is a

discrepancy between the price on the shelf and at the point of sale, customers have multiple options: they can decide not to buy the item at all or to get a refund or to buy the item at the store shelf price. For these reasons, occasional pricing accuracy issues are not deceptive or unfair within the meaning of ICFA. The district court's decision here aligns with these cases and properly applies Illinois' consumer deception statutes.

## III.    Robust government oversight regulates price discrepancies.

Thirty years ago, NIST created a working group "to respond to public concern about price accuracy in retail stores." *Handbook 130*, Examination Procedure for Price Verification, at 207. After input from "[m]ore than 500 retailers, consumer representatives, and state and local weights and measures officials," NIST adopted a procedure to audit stores to help ensure that their controls adequately protect against price discrepancies. *Id.* The examination procedures "enhance the economic well-being of consumers and retail businesses in their jurisdiction." *Id.*

In the decades since, most states have adopted *Handbook 130*'s model examination procedure in some form. *See, e.g.*, R.C. 1327.50(T)(1) (Ohio); 1 N.Y. C.R.R. 220.14 (New York); *see also Handbook 130*, Summary of State Laws and Regulations in Weights & Measures (as of Dec. 1, 2022), § 2, at 5-9 (showing that 42 states have laws and regulations in effect about price verification).

The NIST Handbook specifically envisions that as part of regulatory examinations, some error rate is acceptable.  It concludes that "the error rate shall not exceed 2%," or in other words, "if more than 2 errors are found in the 100-item sample, the store fails."  *Handbook 130*, § 5, at 217 (Table 1).  That is, the national model for state regulation envisions that a store with 98 percent correct pricing would *pass* a regulatory inspection.

NIST's examination procedures establish a system that enables state and local officials to audit retailers uniformly to determine whether they are pricing merchandise accurately.  *Handbook 130*, Examination Procedures for Price Verification, §§ 5-8.  These procedures also create a uniform enforcement system that establishes increasingly severe consequences for sequential audit failures.  *Id.*, § 11.

Outside of NIST's procedures, both states and localities have implemented their own oversight systems to evaluate retail pricing accuracy. These systems often reflect the general NIST structure by prohibiting price discrepancies, authorizing government audits, and imposing increasing penalties for consecutive violations.

Illinois, for example, prohibits misrepresenting the price of "any commodity" offered for sale.  225 ILCS 470/29.  The Director of Agriculture can investigate complaints about alleged price misrepresentations.  225 ILCS 470/11.

22

And if a price misrepresentation arises, the Director can enjoin the conduct and the retailer can face civil penalties that increase with consecutive violations. 225 ILCS 470/56.1; 225 ILCS 470/58. Meanwhile, localities like the City of Chicago audit stores for price accuracy and impose various administrative penalties on retailers who do not meet the regulatory standards. *See Retailers' Rules*, Section 1, Rules 15-16, 22-24, 28, 30 (penalties include revoking the City's certification that allows retailers to avoid placing an individual price tag on each item).

These regulatory schemes are robust and complex. State and local officials take their weights and measures responsibilities seriously. They routinely perform inspections and seek enforcement for any violations found.[20]

---

[20] State of Wisconsin Dep't of Agriculture, Trade and Consumer Protection, Weights and Measures Inspection Statistics for 2021, https://datcp.wi.gov/Pages/Publications/WeightsAndMeasuresInspectionStats.aspx (last visited on Sept. 21, 2023) (showing that 47,260 items were subject to price verification inspections in 2021 and that 98.3% of the time consumers were charged accurately or undercharged); Virginia Dep't of Agriculture and Consumer Services, Press Release: VDACS' Weights and Measures Inspections Protect Virginia's Consumers and Businesses (Mar. 1, 2023), https://www.vdacs.virginia.gov/press-releases-230301-weights-measure.shtml (last visited on Sept. 21, 2023) (noting that 44,475 items were subject to price verification inspections in 2022); Ohio Dep't of Agriculture Annual Report, Weights & Measures Inspections 2021, https://agri.ohio.gov/wps/wcm/connect/gov/ceaa2f00-184c-4cd1-bc84-57f6833e1ca6/2021+ODA+W%2BM_Annual+Report.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKSPACE.Z18_K9I401S01H7F40QBNJU3SO1F56-ceaa2f00-184c-4cd1-bc84-57f6833e1ca6-oplvnAF (last visited on Sept. 21, 2023) (showing that 3,041 establishments in Ohio were subject to a price verification inspection in 2021);

Government focus on price discrepancies has recently garnered much media attention.  Government regulators are doing their job, conducting audits, and—when necessary—imposing civil penalties and other administrative fines.

## IV. Authorizing strict liability class actions over price discrepancies would upset the regulatory system and impose an impossible standard.

### A. Private lawsuits conflict with government oversight.

Class action plaintiffs seek to redirect Illinois' consumer deception law to impose a strict liability standard against retailers under which a single price discrepancy could result in civil liability (and potential statutory damages and attorneys' fees) no matter the processes the store implemented to achieve pricing accuracy or the safeguards in place to notify consumers in the event of inevitable human error.

Strict liability for a people-implemented process is both impossible to achieve and unnecessary for consumer protection.  Discrepancies on shelf tags cannot be entirely eliminated.  Government oversight recognizes that fact by allowing for some degree of variation that reflects the reality of human involvement in shelf level pricing.  *See, e.g.*, *Handbook 130*, § 10.2 (permitting up

---

County of Marin, Dept. of Weights & Measures, *2020 Marin County Consumer Protection Report*, https://www.marincounty.org/-/media/files/departments/ag/consumer-protection-reports/2020-marin-county-consumer-protection-report.pdf?la=en (last visited on Sept. 21, 2023) (showing that 6,338 items were subject to a price verification inspection in 2020 and that 96% of the time consumers were charged accurately or undercharged).

to 2% of inspected items to have a discrepancy); *Retailers' Rules*, Section 1, Rule 22 (permitting up to 4% of inspected items to have a discrepancy). These standards developed by professional weights and measures experts make sense and provide a more realistic standard for store level employees.  Given the 31,000 items on retail shelves, a 2% inaccuracy tolerance would mean that *30,380* items were priced correctly but there was some discrepancy for *620* items. The pricing discrepancies pled here are orders of magnitude lower than the level that expert regulators deemed appropriate—identifying *only six* discrepancies among the *approximately 120,000* items on the shelves in Illinois Walmart stores.  *See* SA11-14.  Plaintiffs' unrealistic strict-liability litigation regime necessarily conflicts with regulatory standards by demanding a level of perfection that government experts do not endorse.

If Plaintiffs' theory here is adopted, civil lawsuits could replace government oversight with a cottage industry of litigation.  Plaintiff here is a good example.  He apparently conducted "investigations" in multiple stores across several states, hunting specifically for price discrepancies.  After finding some, Plaintiff ignored the price displays at the checkout register, pocketed his receipt, and turned a blind eye to Walmart's refund policy.  Plaintiff then returned to the aisles to photograph his receipts next to the shelf prices.  His clear goal was to litigate against Walmart, rather than to use the tools available to

avoid the discrepancy or to get the better price.  The manufactured nature of the litigation further underscores the fact that the Plaintiff was never "deceived" in any sense of the true meaning of the word, nor was he treated "unfairly." Plaintiff concocted the litigation and seeks this court's assistance in codifying the scheme.  Not only did Plaintiff improperly assume the function of a weights and measures official, but he now seeks to impose an impossible zero-tolerance standard that conflicts with the actual regulatory scheme.

### B.    Private lawsuits would have adverse consequences.

Private enforcement of a strict liability regime would impose extraordinary burdens on courts, retailers and their employees.  Because the demanded standard of perfection is impossible to satisfy, litigation over price discrepancies will never end.  And if a single mistake will justify a lawsuit, class litigation will proliferate on just a handful of price discrepancies.  The costs typically borne by the executive branch in regulating and enforcing price accuracy standards (as contemplated by the legislature) will be multiplied and transferred to the judiciary.

This outcome won't benefit customers, retailers or store employees either. Stores already face high standards and significant repercussions from government oversight.  Imposing an impossible standard will not increase price

accuracy for customers.  But increased litigation costs may increase the price of goods.

In short, addressing the accuracy of prices on shelf labels under the existing weights and measures system of government oversight makes practical and economic sense.  Mistakes that lead to price discrepancies should be addressed by the executive branch, not by private plaintiffs and their attorneys.

## CONCLUSION

The Court should affirm the decision of the district court.

Dated: September 22, 2023                    Respectfully submitted,

                                             */s/ Matthew A. Fitzgerald*

Deborah R. White                             Matthew A. Fitzgerald
RETAIL LITIGATION CENTER, INC.               MCGUIREWOODS LLP
99 M Street, S.E., Suite 700                 800 East Canal Street
Washington, DC 20003                         Richmond, VA 23219
T: (202) 869-0200                            T: (804) 775-4716
deborah.white@rila.org                       F: (804) 698-2251
                                             mfitzgerald@mcguirewoods.com

*Counsel for Amici Curiae Retail Litigation Center, Inc., National Retail Federation, FMI – The Food Industry Association, and Illinois Retail Merchants Association*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Circuit Rule 29 because it contains 4,847 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).  This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (13-point Book Antiqua).

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.  All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald
